# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

COLLAR JOBS, LLC, et al.,          )     CASE NO. 1:22-CV-1892

    Plaintiffs,            )

v.                        )     JUDGE DONALD C. NUGENT

BENJAMIN STOCUM, et al.,        )

    Defendants.           )     **MEMORANDUM OF OPINION**

## I.  INTRODUCTION

This matter is now before the Court on Plaintiffs' motion for a preliminary injunction in connection with their *Verified Complaint and Derivative Complaint for Preliminary and Permanent Injunction, and Money Damages*, filed on October 20, 2022.  (ECF #1).[1]

The named Plaintiffs in this action are Collar Jobs, LLC, a Delaware limited liability company with its principal place of business in Austin, Texas, and Collar Diversified, LLC, an

---

[1]    On this same date, Plaintiffs filed a *Motion for Temporary Restraining Order*, with a brief in support and a proposed order.  (ECF #2).  The Court then set a telephonic status conference on Plaintiffs' temporary restraining order ("TRO") motion for 10:00 am on October 21, 2022.  (ECF *Non Document Notice*, entered 10/20/2022).  At the status conference, with all parties participating, the motion for TRO was held in abeyance and the Court set a hearing on Plaintiffs' motion for preliminary injunction for 9:00 am on October 31, 2002 (later changed to November 1, 2002), with all parties ordered to commence discovery and to work together to be prepared for the hearing.  (ECF #8).

Ohio limited liability company with its principal place of business in Solon, Ohio. (ECF #1, PageID #5, ¶¶ 8-9).

Collar Jobs is 100% owned by an entity named Park Resilience Holdings, and Park Resilience Holdings is 100% owned by Collar Jobs' (and Park Resilience Holdings') principal Geoffrey Loree ("Loree"). (ECF #16 [Hearing Tr. 11/01/22], PageID #379-380 (*Loree*)).

Collar Diversified, LLC ("Collar Diversified") is a joint venture between Plaintiff Collar Jobs, LLC ("Collar Jobs") and Defendant Delta Diversified, Inc. ("Delta Diversified"), with each joint venture partner owning a 50% share of Collar Diversified. (ECF #16 [Hearing Tr. 11/01/22], PageID #379-380 (*Loree*); ECF #17 [Hearing Tr. 11/02/22], PageID #598 (*Stocum*)). Collar Jobs asserts in its *Complaint* that it brings this action both on behalf of itself and derivatively on behalf of Collar Diversified under the provisions of Ohio Revised Code §§ 1706.61-1706.617. (ECF #1 [Complaint], PageID #3, ¶ 11).

The facts involved this case relate to the formation and the activities of Collar Diversified, the Operating Agreement under which Collar Diversified is managed and governed, the duties and obligations of the Operating Agreement, and the duties and obligations of Employee Agreements and Nondisclosure Agreements entered into by the Employees.

The named Defendants are Delta Diversified, Benjamin Stocum ("Stocum"), who owns the controlling interest of Delta Diversified, and nine employee individuals, identified as Cheryl Pearson, Christina Rakich, Regina Ziccardi, Abigail Burke, Cullen Berelka, Emily Slak, Cassidy Czikray, Madison Lewis, and Sean Hyde, all of whom are Ohio residents, and each of whom performed services for Collar Diversified (the individual employee Defendants will be collectively referred to as "Employee Defendants" unless individual identification is needed).

(ECF #1 [Complaint], PageID #5-6, ¶¶ 13-23).[2]

Plaintiffs' complaint asserts fifteen claims:  misappropriation of trade secrets on behalf of Collar Jobs against all Defendants under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.* (Count I); misappropriation of trade secrets on behalf of Collar Jobs against all Defendants under the Ohio Uniform trade Secrets Act, Ohio Rev. Code § 1333.61, *et seq.* (Count II); misappropriation of trade secrets on behalf of Collar Diversified against all Defendants under the Defend Trade Secrets Act (Count III); misappropriation of trade secrets on behalf of Collar Diversified against all Defendants under the Ohio Uniform trade Secrets Act (Count IV); breach of the Operating Agreement on behalf of Collar Jobs against Delta (Count V); breach of the Operating Agreement on behalf of Collar Diversified against Delta (Count VI); breach of fiduciary duty on behalf of Collar Jobs against Delta (Count VII); breach of fiduciary duty on behalf of Collar Diversified against Delta (Count VIII); breach of noncompete obligations on behalf of Collar Diversified against Employees (Count IX); breach of nondisclosure obligation on behalf of Collar Jobs against Employees (Count X); tortious interference with contractual relationship on behalf of Collar Diversified against Defendants Stocum and Delta (Count XI);

---

[2] Since the filing of Plaintiffs' *Verified Complaint and Derivative Complaint for Preliminary and Permanent Injunction, and Money Damages* (ECF #1), Defendants have responded with their own filing, *Defendants' Answer to Plaintiffs' Complaint, Counterclaim, and Third Party Complaint.* (ECF #11). Defendants' counterclaims against Plaintiff Collar Jobs assert:  fraud (Count I); fraudulent inducement (Count II); breach of contract (Count III); and breach of fiduciary duties (Count IV). (ECF #11, PageID #315-324, ¶¶ 1-78). Defendants third-party complaint asserts claims against Geoffrey Loree, who owns and operates Plaintiff Collar Jobs through Park Resilience Holdings, LLC, alleging: fraud (Count I); fraudulent inducement (Count II);breach of contract (Count II); and breach of fiduciary duties (Count IV).  (ECF #11, PageID #325-326, ¶¶ 1-11). This *Memorandum of Opinion* addresses only the immediate matter before the Court, Plaintiffs' motion for a preliminary injunction.

tortious interference with contractual relationship on behalf of Collar Jobs against Defendants Stocum and Delta (Count XII); conversion on behalf of Collar Jobs against all Defendants (Count XIII); conversion on behalf of Collar Diversified against all Defendants (Count XIV); and a prayer for preliminary and permanent injunction (Count XV). (ECF #1, PageID #24-39, ¶¶ 129-227).

Jurisdiction is asserted under the federal question statute, 28 U.S.C. § 1331, based on the Defend Trade Secrets Act. Supplemental federal jurisdiction over the non-federal claims is asserted on the ground that such claims arise out of the same facts and circumstances as the federal claims. (ECF #1, PageID #6, ¶ 24).

Plaintiffs seek a preliminary injunction against Defendants Delta Diversified and Stocum, requesting an order enjoining them from:

"(1) interfering with Collar Jobs' management and operation rights as a 50% member of [Collar Diversified],[3] in violation of the Operating Agreement;

"(2) using, disclosing, copying, or transmitting [Collar Diversified's] confidential and proprietary information;

"(3) using, disclosing, copying, or transmitting Collar Jobs' confidential and proprietary information, and

"(4) employing the Employee Defendants under [Delta Diversified] or Collar Talent."[4]

(ECF #2 [*Plaintiffs' Motion for Temporary Restraining Order*], PageID #204).

---

[3]

Plaintiffs' complaint refers to Collar Diversified as the "Company." For the purposes of this *Memorandum of Opinion*, the term "Collar Diversified" will be used.

[4]

The identity of Collar Talent is addressed in the findings of fact portion of this *Memorandum of Opinion* (*infra*, at p. 17).

Plaintiffs also seek injunctive relief against the Employee Defendants enjoining them from:

> "(1) working for, with, or on behalf of [Delta Diversified] or Collar Talent in violation of their non-compete provision in their Employment Agreements;
>
> "(2) using, disclosing, copying, or transmitting Collar Jobs' confidential and proprietary information for any purpose, in violation of the Nondisclosure Agreement with Collar Jobs; and
>
> "(3) using, disclosing, copying, or transmitting [Collar Diversified's] confidential and proprietary information for any purpose, in violation of federal and Ohio law."

(ECF #2, PageID #204-205).

The Court held a two-day hearing on Plaintiffs' motion for preliminary injunction. The parties thereafter submitted written closing arguments (ECF #19 [Plaintiffs] & ECF #29 [Defendants]), and proposed findings of fact and conclusions of law, (ECF #21 [Plaintiffs] & ECF #28 [Defendants]).

After considering the evidence presented at the hearing, and the written submissions of the parties, the Court finds that Plaintiffs have not met the standards necessary for the granting of a preliminary injunction.  Accordingly, Plaintiffs' motion for preliminary injunction is DENIED.[5]

## II.  **FINDINGS OF FACT**

The Court held a two-day hearing on the motion for preliminary injunction on November 1 and 2, 2022.  (ECF #14 [*Minutes of Proceedings 11/01/2022*] & ECF #15 [*Minutes of*

---

[5]

Given the Court's denial of Plaintiffs' motion for preliminary injunction in its entirety, and there being no motion before the Court regarding whether Collar Diversified is properly a Plaintiff in this case under the provisions of Ohio Revised Code §§ 1706.61-1706.617 (given that there has been no consent from 50% partner in Collar Diversified, Delta Diversified, to bring this action), the Court makes no ruling at this time on the propriety of Collar Diversified unilaterally being named as a Plaintiff by Collar Jobs..

*Proceedings 11/02/2022*].  The Court heard testimony from the following witnesses: Geoffrey Loree, Abigail Burks, Christina Rakich, Sean Hyde, and Benjamin Stocum.  At the hearing, the Court admitted Plaintiffs' Exhibits 1 through 25, and 27 through 34, and Defendants' Exhibits B through F.  Afterward, the parties submitted written closing arguments and proposed findings of fact and conclusions of law.  Based on the evidence presented, the Court makes the following findings of fact in its analysis of whether to grant a preliminary injunction at this stage of the case.[6]

In May, 2020, Collar Jobs and Delta Diversified created a joint venture business arrangement, to be called "Collar Diversified, LLC."  (ECF #18-1, PageID #792 [Operating Agreement, Hearing Ex. 1]).  Each of the joint venture partners, Collar Jobs and Delta Diversified, owns a 50% share (ECF #16 [Hearing Tr. 11/01/22], PageID #379-380 (*Loree*); ECF #17 [Hearing Tr. 11/02/22], PageID #598 (*Stocum*)).  The governing document by which Collar Diversified was created and thereafter operated was the "Operating Agreement of Collar Diversified, LLC."  (ECF #18-1 [Operating Agreement, Hearing Ex. 1], PageID #792-806).  While not explicitly stated in the Operating Agreement, nor stated directly by any of the witnesses at the hearing, the basic purpose of Collar Diversified was to match persons in the building technologies industry seeking new jobs with employers in the building technologies industry

---

[6]

> At the preliminary injunction stage, a district court does not resolve "doubtful or difficult questions of law or disputed questions of fact." *Neveux v. Webcraft Techs.*, 921 F. Supp. 1568, 1572 (E.D. Mich. 1996) (citing *Int'l Molders' and Allied Workers' Local Union v. Nelson*, 799 F.2d 547, 551 (9th Cir. 1986)); *see also Sargent v. Am. Greetings Corp.*, 588 F. Supp. 912, 925 (N.D. Ohio 1984) (denying motion for preliminary injunction in part because genuine issues of material fact existed).  The factual findings of a court deciding a motion for preliminary injunction are not binding in the underlying lawsuit.  *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

seeking new talent.  (*See, e.g.*, Hearing Ex. F [Page from "Collar" website describing various "Collar" entities][7] ("Collar Diversified: The #1 *on-demand* hiring platform for the Building Technologies industry" (emphasis in original)).  Essentially, Collar Diversified was a recruiting firm identifying persons in the building technology industry seeking new positions in the marketplace and working with them to find new positions with employers looking to fill positions.

The basic process by which this would work is that Collar Jobs would identify names of prospective candidates looking for new employment in the building technology industry and e-mail those names to hiring specialists working at Collar Diversified, then the hiring specialists, over the course of many months, would communicate with the candidates to obtain an array of information regarding the candidate's experience, and then enter the information and various notes onto a third-party database purchased by Collar Jobs called "Bullhorn," and then that information would be used throughout the representation to assist the Collar Diversified hiring specialists in placing the candidates with employers drawn from Delta Diversified's longtime client list of employers seeking new talent.  (*See, e.g*, ECF #16 [Hearing Tr. 11/02/22], PageID #561-562 (*Rakich*) (describing general process); *Id*, PageID #587 (*Hyde*) (same)).

The Operating Agreement contains no specific description or delineation of the specific roles of Collar Jobs and Delta Diversified, (*see* ECF #18-1 [Operating Agreement]), within the business plan of Collar Diversified.  The overall evidence produced at the hearing established that

---

[7]  Most, but not all, of the hearing exhibits introduced by Plaintiffs, as well as some of the exhibits introduced by Defendants, were filed by Plaintiffs on the Court's ECF system, (ECF #18), and will be referred to by their ECF identification.  While some hearing exhibits have not yet been formally filed, all of the exhibits introduced at the hearing were received and admitted without objection.  (ECF #17 [Hearing Tr. 11/02/22], PageID #787 (*Court*)).

Collar Jobs' primary role was to identify potential candidates seeking new positions within the industry and Delta Diversified's primary role was to draw on its longstanding presence and contacts within the employment recruiting field to identify business technology employers seeking to fill positions. Not surprisingly, the parties' describe their respective roles somewhat differently.

Collar Jobs describes its role as assembling data offline and online to identify persons who were interested in new employment, verifying that the person identified was real and had an interest in new job opportunities, vetting the person identified as a "lead" to make sure they were appropriate for open positions, inputting the candidate information into a third-party licensed database called "Bullhorn," then passing on that "hot lead" to the hiring specialists at Collar Diversified to work with the candidates using a proprietary "workflow system" developed solely by Collar Jobs to allow the candidates to proceed toward finding employment. (ECF #16 [Hearing Tr. 11/01/22], PageID #395-396 (*Loree*)). Collar Jobs describes Delta Diversified's role as "provid[ing] the cash flow for the personnel, . . . provid[ing] managerial and administrative duties related to the business[,] and br[inging] some traditional recruiting experience" to the joint venture. (ECF #16 [Hearing Tr. 11/01/22], PageID #393 (*Loree*)). Collar Jobs also states that its contributions included "the brand, the logo, marketing, advertising, and website." (ECF #16 [Hearing Tr. 11/01/22], PageID #394 (*Loree*)).

Delta Diversified describes the "hot leads" provided by Collar Jobs to Collar Diversified (though a payment of a monthly "subscription fee" paid by Collar Diversified to Collar Jobs) as, essentially, "a name, maybe an e-mail address, maybe a personal phone number, and usually a copy of a publicly-available LinkedIn profile, ." (ECF #17 [Hearing Tr. 11/02/22], PageID #693

(*Stocum*)).

As to the "workflow system," Delta Diversified states that the process used by the Collar Diversified hiring specialists to work with the client job-seekers was something that was developed jointly by everyone at Collar Diversified, and was primarily based on a "workflow system" that Delta Diversified had been using for over 20 years recruiting in the business technology industry. (*See, e.g.*, ECF #17 [Hearing Tr. 11/02/22], PageID #693 (*Stocum*) (describing that after Collar Diversified received the name, e-mail address, phone number, and LinkedIn profile from Collar Jobs through the paid-for subscription, "then, the system that Collar Diversified runs then kicks in and starts updating the data, appending that data[;] we would make no placements if it weren't for all of those personnel that you saw yesterday [Collar Diversified employees Burke, Rakich, and Hyde] taking the lead and then turning that into a candidate that can be marketed[;] and then, they have to follow up on the marketed material with the employers and find out who would like to take interviews, answer additional questions[;] and then all of that information continues to get stored in the database as well"); *see also* ECF #17 [Hearing Tr. 11/02/22], PageID #650-651 (*Stocum*) ("[T]he workflow that's being claimed as Collar Jobs' proprietary information is at – that is not accurate. The workflow that we use at – for working in the Collar Diversified, you know, business was created by the combined efforts of Geoff [Loree], Cheryl Pearson, Madison Lewis, all of our joint collaborative experiences. We have adapted how we use data, what key pieces of data we keep track of. If you did a – I'm sure that if you looked at a change log in Bullhorn, you would see how many different changes occurred from the time we started using it for Collar Diversified business and today. That is a workflow and those are systems that were created as a joint collaborative effort for the people working on behalf of Collar

Diversified.")).

Delta Diversified specifically describes the role and value Delta Diversified brought to the table as:

> [T]he entire business of Collar Diversified was built off the backbone of Delta Diversified's 20 years of experience working in that specific industry with those specific clients.  And what Collar Diversified was formed to do, because Geoff [Loree] did have a valuable approach, was identifying very specific types of candidates that we weren't fulfilling searches for at Delta Diversified.
>
> That's why Delta provided the clients [seeking to fill positions], the know-how, the workflow, the process of turning leads into money, but there was a gap in what with we were able to provide our clients and that's what Collar Diversified filled at its outset.

(ECF #17 [Hearing Tr. 11/02/22], PageID #610 (*Stocum*)).

There are currently nine persons employed to represent Collar Diversified in the marketplace: Cheryl Pearson, Cassidy Czikray, Christina Rakich, Madison Lewis, Abigail Burke, Regina Ziccardi, Cullen Berelka, Emily Slak, and Sean Hyde.  (ECF #17 [Hearing Tr. 11/02/22], PageID #643 (*Stocum*)).  While each of these persons work on behalf of Collar Diversified, they are each in fact employees of Delta Diversified (ECF #17 [Hearing Tr. 11/02/22], PageID #602 (*Stocum*)): their checks are paid by Delta Diversified (*Id.*, PageID #605); the federal tax forms related to their employment (I-9s/W-9s) list them as employees of Delta Diversified (*Id.*); the State of Ohio recognizes them as employees of Delta Diversified (*Id.*); and while their Employment Agreements say "Collar Diversified LLC" on the first page, they are signed on behalf of the "Company" (identified in the opening paragraph as "Collar Diversified, Inc.") by Delta Diversified and its CEO (who is not a Collar Diversified LLC employee) James Hyde. (ECF #18-2 [Welcome Package], PageID #809-811).  In addition to the Employment Agreements, each of the employees (with the possible exception of Sean Hyde) signed Nondisclosure

-10-

Agreements between themselves and Collar Jobs. (ECF #18-2 [Welcome Package], PageID #812-816).[8]

Over the course of the first 29 months of Collar Diversified's existence (from its inception in May 2020 through mid-October 2022), Collar Jobs had been paid a total of $968,950.00 in "subscription fees" out of the assets of Collar Diversified. (ECF #18-3 [Profit & Loss Statement, Hearing Ex. 3], PageID #852). As of this same time-frame, Delta Diversified, which incurred 100% of the operating expenses of Collar Diversified (including the payment of salaries), for which it was to be paid a monthly "shared services" amount, had not actually been paid anything out of the sums earned by Collar Diversified, but was rather owed $279,269.04 in shared services fees. (ECF #18-23 [Collar Diversified LLC Balance Sheet, Hearing Ex. B], PageID #977).

Testimony was introduced at the hearing that, in late August or early September 2022, saying that "he had to make more money and he needed to focus on other things in his life," Collar Jobs' principal Geoffrey Loree informed Delta Diversified principal Benjamin Stocum that "he wasn't going to be coming in and being part of the day-to-day operations" and that he "didn't care if we [Collar Diversified] continued paying the subscription payment." (ECF #17 [Hearing Tr. 11/02/22], PageID #614-615 (*Stocum*); *see also Id.*, PageID #616, 627, 637, 667, 672, 675, 700; ECF #16 [Hearing Tr. 11/01/22], PageID #219-220 (*Hyde*)). Loree denies that he told Stocum in August or September that he did not want to be involved in the company anymore, (ECF #16 [Hearing Tr. 11/01/22], PageID #405, 455 (*Loree*)), but he did state that he has not been in the office at any time after the first week of September 2022, and that he was never "regularly

---

[8]
      Sean Hyde testified that he never signed either an Employment Agreement or a Nondisclosure Agreement. (ECF #16 [Hearing Tr. 11/01/22], PageID #575).

active in the day-to-day in the office." (*Id.*, PageID #457).

On September 18, 2022, Collar Jobs principal Geoffrey Loree sent an e-mail to Madison Lewis, whose job includes branding work for the joint venture, (ECF #17 [Hearing Tr. 11/02/22], PageID #697 (*Stocum*)), instituting a new policy asking that everyone henceforth be identified as "Title at Collar Diversified," and that all the branding on the joint venture's LinkedIn and internet references (which sites were housed on accounts controlled by Collar Jobs, ECF #16 [Hearing Tr. 11/01/22], PageID #394-395 (*Loree*)), should now show a newly-created "Collar Diversified" logo and be titled "Collar Diversified." (ECF #18-12 [Hearing Ex. 16], PageID #868; ECF #18-24 [Hearing Ex. D], PageID #979-980). Prior to sending this e-mail, Loree had not communicated anything to Delta Diversified principal Benjamin Stocum about the new brand change, in writing or otherwise. (*See* ECF #16 [Hearing Tr. 11/01/22], PageID #497-498 (*Stocum*)). While Stocum later sent an e-mail to Madison Lewis consenting to the unilateral branding changes, the hearing testimony indicated that, after consulting with others, he decided to just let the changes "go forward." (ECF #17 [Hearing Tr. 11/02/22], PageID #662-663 (*Stocum*) ("I did not approve [the branding changes] with discussion. He [Loree] forced it out. And from a standpoint of maintaining – I didn't want to create more friction with the team, so I said go ahead, go forward with this. . . . After Geoff [Loree] forced that brand change through Madison Lewis and didn't copy me, didn't discuss it with me, after he just unilaterally directed her, I had some counsel with one of my business partners, and then I responded to the message and I said go ahead, go forward.")). Throughout the hearing, witnesses testified that for all of the existence of the joint venture – before any purported "brand change" or otherwise – and to this day – employees would refer to themselves in communications with clients as simply "Collar" rather than "Collar

-12-

Diversified" or "Collar Talent." (*See, e.g.*, ECF #16 [Hearing Tr. 11/01/22], PageID #534-535 (*Burke*), PageID #559-560 (*Rakich*), PageID #579-580 (*Hyde*); ECF #17 [Hearing Tr. 11/02/22], PageID #631-632 (*Stocum*)). There was testimony presented at the hearing that the logo that was ultimately instituted for Collar Diversified was essentially a stock image available on the internet, (ECF #16 [Hearing Tr. 11/01/22], PageID #132 (*Loree*); *see also* Hearing Ex. C [Internet page showing "Collar Logo HD Stock Images"]), and that it was never registered with the State of Ohio as a proprietary mark. (ECF #16 [Hearing Tr. 11/01/22], PageID #132 (*Loree*)).

A few days earlier, on September 12, 2022, stating that he had seen an unauthorized "data breach" on the Bullhorn database based on a perceived "abnormal amount of page hits," Geoffrey Loree, and his son Gabe Loree, unilaterally shut down the Bullhorn system such that none of the Collar Diversified employees (including not only the hiring specialists, but also business analyst Sean Hyde and Delta Diversified principal Benjamin Stocum) could access it. (Hearing Ex. 4 [E-mail string between Gabe Loree and "Team"]; *see also* ECF #16 [Hearing Tr. 11/01/22], PageID #409-411 (*Loree*); ECF #17 [Hearing Tr. 11/02/22], PageID #662 (*Stocum*)). Later that day – approximately two hours later with respect to the hiring specialists and approximately five hours later with respect to Stocum and Hyde – the Bullhorn system went back online. (ECF #16 [Hearing Tr. 11/01/22], PageID #411 (*Loree*)). Testimony introduced at the hearing indicated that the high volume of "hits" on the Bullhorn system were likely the result of Collar Diversified business analyst Sean Hyde accessing the system to create a manually-created spreadsheet showing the business activity of each of the hiring specialists. (Hearing Ex. 8; *see also* ECF #16 [Hearing Tr. 11/01/22], PageID #568-572 (*Hyde*)). Other testimony introduced at the hearing indicated that Hyde had regular communications with Loree throughout the entire time Collar

-13-

Diversified existed, (ECF #16 [Hearing Tr. 11/01/22], PageID #568 (*Hyde*)), and that he regularly created such spreadsheets "outside of the database" (in effect, not created by an operational function of the Bullhorn database) based off of information within the database (*Id*). Hyde testified on a number of occasions that he did this regularly, and that it was "part of his job." (ECF #16 [Hearing Tr. 11/01/22], PageID #584, 585, 586, 588, 591; *see also* ECF #17 [Hearing Tr. 11/02/22], PageID #645, 646, 713, 714 (*Stocum*) (describing Hyde's preparation of spreadsheets from data found on Bullhorn as "that was his job")). Hyde later testified that on September 30, 2002, he had e-mailed a copy of the spreadsheet identified as Hearing Exhibit 8, which he had been putting together "for months to do my job," (ECF #16 [Hearing Tr. 11/01/22], PageID #591 (*Hyde*)), to his home e-mail address in anticipation that Geoffrey Loree might shut off the Bullhorn system again, as he had done approximately two weeks earlier. (ECF #16 [Hearing Tr. 11/01/22], PageID #583 (*Hyde*)).

At the hearing, Benjamin Stocum testified that, on September 30, 2022, in response to his conversations with Geoffrey Loree about Loree wanting to focus on other things, and in light of the unilateral shutdown of the Bullhorn system, he sent an e-mail to Loree stating:

> Geoff,
>
> I would like to buy the following:
>
> - 1% of Collar Diversified from you
> - A replicate of our Bullhorn database under my administrative control
> - The collardiversified.com domain name
> - Archived emails from Collar Diversified operations from start to present
>
> I have directed Jim [Hyde, CEO of Delta Diversified] to hold off on any financial transfers, until we figure out whether or not we can come to terms.
>
> Regards,
> Benjamin Stocum – President

-14-

(ECF #18-4 [Hearing Ex. 5], PageID #853). Stocum testified at the hearing that the reason he

made the offer to formally purchase a controlling interest in the joint venture was to provide

continuity with the business. (ECF #17 [Hearing Tr. 11/02/22], PageID #748 (*Stocum*)). He also

testified that part of his motivation was also a perceived "friction" developing in the operation

based on accusations about "unauthorized access" to the Bullhorn operating system and Loree's

unilateral shutting down of the system:

> I recognized, when Geoff advised me that he was no longer interested in being part of the day-to-day operations, I recognized that – and he also explained that he needed – I need to make more money. It doesn't – it was very clear to me with some of the other things that happened from that conversation, the kind of disconnecting the database, the kind of accusations, of some improper behavior with Sean, the back-channel communications that were happening with other employees, all of that had been swirling around the office, it was obvious that the status quo, as far as how Geoff and I were organized or how the business was organized under the operating agreement, it didn't – it didn't feel like this was going to be effective.

> * * *

> And at the same time, there were direct communications between Geoff and other employees that were coming back to me, the employees, Madison, Cheryl – so Madison Lewis, Cheryl Pearson, and Christina Rakich were all coming back to me saying, hey, Geoff's asking these kind of questions. And Cheryl was saying Geoff's accusing Sean of – of doing things that are improper and he – she felt very much like it was all – it felt very concerning. And everybody was very – it was all this very suspicious stuff. Cheryl would share that kind of feedback from the conversations she had with Geoff, she would share it with me and she would share it with Jim Hyde, who is Sean's dad.

> The environment was really tense and very suspicious and it wasn't healthy. It just wasn't healthy. And all I was trying to do was I wanted the business – I wanted the business to be able to continue operating. I wanted to kind of depressurize things, eliminate friction, and let these young professionals operate in a functional way.

(ECF #17 [Hearing Tr. 11/02/22], PageID #744-748 (*Stocum*) (cleaned up to eliminate repeated

-15-

use of the words "you know")).

In response to Stocum's communication about buying a controlling interest in Collar Diversified, on October 7, 2022, Loree replied to Stocum, "If you would like to buy the entire stake that Collar Jobs owns, we'd be obliged to consider that." (ECF #16 [Hearing Tr. 11/01/22], PageID #416 (*Loree*); *see also* ECF #17 [Hearing Tr. 11/02/22], PageID #745 (*Stocum*)).  At 2:09 pm the same date, Loree sent Stocum an e-mail stating that he had, again, unilaterally shut down the Bullhorn operating system:

> Benjamin,
>
> We have encountered another significant breach of terms and data.  However, this time we believe we have identified those in violation.  We have currently suspended the platform while we work with our technical team and partners to try and get back up and running and identify the extent of the damage.
>
> Additionally, I am in contact with counsel and the authorities.
>
> Regards,
>
> Geoffrey P. Loree
> *Founder*
> Collar

(ECF #18-5 [Hearing Ex. 6], PageID #856).

Afterward, at 2:20 pm the same day, Stocum sent Loree the following e-mail:

> I encourage you to relax and communicate with me on a more open and prompt basis.  I continue to view you and Gabe as business partners in our 50/50 venture.  There has been no activity that requires counsel and/or authorities.  I notified you last week that we were no longer transferring funds.  There are changes being made that are in the best interest of Collar Diversified LLC, which we both own.  I have taken no action that is outside of the historical standards we've set in the past couple of years.
>
> I have my hands full right now, but I will speak with you later this afternoon, if you want.

-16-

Regards,
Benjamin

(ECF #18-5 [Hearing Ex. 6], PageID #855).

The referenced "changes being made" to Collar Diversified was that Stocum had been undergoing efforts to create new imaging, a new website, new web addresses, a new LinkedIn site, new e-mail addresses, and new phone numbers for Collar Diversified within his administrative control, which he stated he had done in response to Loree saying he no longer wanted to be involved in the day-to-day business of the joint venture. (ECF #16 [Hearing Tr. 11/01/22], PageID #619-620 (*Stocum*); *see also, generally* ECF #18-17 [Hearing Ex. 23] (collected e-mails between Benjamin Stocum and The Karcher Group (TKG) regarding changes to website imaging), *and specifically*, PageID #955 referencing the desire to have branding ability not unilaterally controlled by Collar Jobs, "Our company name is Collar Diversified LLC, but the imaging that you see here is 'owned' by Collar Jobs LLC, which I have no control over. My objective is to set up properties that I have the control of")).

In moving forward, while the joint venture would still be Collar Diversified, it would be marketed as "Collar Talent." (*See, e.g.*, ECF #18-17 [Hearing Ex. 23], PageID #955 ("I would like to go to market as "Collar Talent")). Collar Diversified's clients were informed that, while "Collar" was remaining the same "Collar Diversified" entity that they had been working with, there would be a new brand ID and communications platforms, as stated in e-mail communications sent to clients on October 7, 2022:

> Collar has made some changes to our brand ID and our communications platforms. We will be operating in the market as Collar Talent – www.collartalent.com – going forward and will be using @collartalent.com email domain addresses. The accounts@collardiversified.com email will no longer be monitored.

-17-

> For tax and legal purposes, nothing has changed, we are still Collar Diversified LLC with the same Tax ID information. Our CEO, Benjamin Stocum will also be following up with a phone call to verify this information and answer any questions you may have. Thank you for your business.
>
> Regards,
> Collar Talent Accounts Team

(ECF #12-1 [Exhibit 2 to Defendants' Brief in Opposition to Plaintiff's Motion for Preliminary Injunction], PageID #355). Stocum admitted at the hearing that he undertook these changes to Collar Diversified's branding without informing Loree of the changes. (ECF #17 [Hearing Tr. 11/02/22], PageID #620-621 (*Stocum*)).

Later that day, at 6:03 pm, Stocum e-mailed Loree telling him that Collar Diversified had separated from the brand identification platforms that had been solely controlled by Collar Jobs, and had moved to communications platforms administratively controlled by Stocum. (ECF #18-5 [Hearing Ex. 6], PageID #854). The e-mail went on:

> I have every intention of honoring our Operating Agreement and continuing to make Collar Diversified LLC a highly profitable enterprise . . . . At this point in time, I do not have any interest in Collar Jobs, or whatever other business ventures you are pursuing/developing. I am going to build this business in the vision that you and I once shared and eventually you'll benefit handsomely.
>
> While I'm not interested in leveraging the Collar Jobs platform anymore, I still hold you in high regard professionally and I still love you, as a dear friend. In addition, I welcome your continued involvement in Collar Diversified, if you remain interested.
>
> Before my Dad died, he asked me to take good care of you. I intend to live up to that. I'll understand if you're upset with my approach, but I hope with time, it will be proven the right path for the entirety of Collar Diversified.

(*Id.*).

The testimony presented at the hearing indicates that "Collar Talent" is the same entity as Collar Diversified in its entirety, with the same Operating Agreement, same business operations,

-18-

same clients, same location, same offices, same employees, and same ownership. (*See, e.g.*, ECF #16 [Hearing Tr. 11/01/22], PageID #527 ("[W]e were doing a rebranding"), #535 ("Nothing's changed"), #541 ("None of that [working for Collar Diversified, and getting checks from Delta Diversified] has ever changed"), #547 ("[N]o difference between the way [I] identified [myself] before the changeover and rebranding and now") (*Burke*); ECF #16 [Hearing Tr. 11/01/22], Page ID #559 ("[N]ever changed employers"), #560 (never changed the way of identification with clients, remaining as "Collar"); ECF #16 [Hearing Tr. 11/01/22], PageID #580 (never changed way of identifying with clients as simply "Collar") (*Hyde*); ECF #17 [Hearing Tr. 11/02/22], PageID #611 ("Collar Diversified is the same entity and has never changed"), #616 ("there's no new entity"), #659 ("I also made it clear [to the Collar Diversified employees] that we are not going to be changing the company[;] we are Collar Diversified"), #660 ("[W]e are still Collar Diversified"), #763 ("They're [the employees] operating the business as they did on October 6th with the same approaches") (*Stocum*)).

The testimony presented at the hearing also indicates that no one at Collar Diversified has ever competed with Collar Diversified, reverse engineered any information used at Collar Diversified, shared any information from within Collar Diversified with anyone outside of Collar Diversified, or collected any fees for anyone but Collar Diversified. (*See, e.g*, ECF #16 [Hearing Tr. 11/01/22], PageID #541 (never reversed engineered), #542 (never competed with Collar Diversified), #542 (never given candidates to any other company), #542 (never collected fees for anyone but Collar Diversified); ECF #16 [Hearing Tr. 11/01/22], PageID #558 (never disclosed anything learned at work for Collar Diversified), #558 (never reverse engineered), #560 (never taken leads from Loree and given them to anyone outside Collar Diversified) (*Rakich*); ECF #16

[Hearing Tr. 11/01/22], PageID #569 (never shared information with competitors), #578 (never competed with Collar Diversified), #578 (never diverted clients or employees from Collar Diversified), #584 (never shared Bullhorn or spreadsheet information outside of Collar Diversified), #587 (creation of spreadsheets not for resale or competition) (*Hyde*)).

One additional factual finding can be drawn from the hearing testimony and evidence. While the Operating Agreement contained a provision whereby no actions could be taken on behalf of the joint venture without approval of the members holding at least a majority of the units – which, with Collar Jobs and Delta Diversified each owning 50% of the joint venture, effectively meant "mutual agreement" – or without written agreement, (ECF #18-1 [Operating Agreement, §§ 5.7(a) & 5.7(c)], PageID #797), it is clear that *both* Collar Jobs (unilateral rebranding and unilateral shutting down of the operating system on two occasions – and, most recently, bringing a lawsuit on behalf of Collar Diversified without equal joint venture partner Delta Diversified's consent) and Delta Diversified (later unilateral rebranding and removal of Collar Diversified from the Collar Jobs candidate identification platform) each took significant actions on behalf of Collar Diversified without informing the other party or obtaining consent from the other party in writing to take such actions.

## III. LEGAL ANALYSIS

### A. Controlling Law

#### 1. *Preliminary Injunction*

A district court uses equitable principles of federal law in determining whether to issue a preliminary injunction. *Southern Milk Sales v. Martin*, 924 F.2d 98, 102 (6th Cir. 1991). In evaluating a motion for preliminary injunction under Federal Rule of Civil Procedure 65, a court

balances the following four factors: "whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *Southern Glazer's Distributors of Ohio, LLC v. Great Lakes Brewing Company*, 860 F.3d 844, 849 (6th Cir. 2017); *see also Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000); *Blue Cross & Blue Shield Mut. Of Ohio v. Blue Cross & Blue Shield Ass'n*, 110 F.3d 318, 322 (6th Cir. 1997). The grant of a preliminary injunction is an extraordinary remedy, and the moving party has the burden of proving that the circumstances clearly demand it. *Penetone Corp. v. Palchem Inc.*, 627 F. Supp. 997, 1004 (N.D. Ohio 1985).

In considering a motion for preliminary injunction under the four factors, the Court considers these four factors in the aggregate, "balanced according to their relative strengths." *Fed. Sav. & Loan Ins. Corp. v. Quinn*, 711 F. Supp. 366, 376 (N.D. Ohio 1989), *vacated on other grounds*, 922 F.2d 1251 (6th Cir. 1991) (citing *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985)). The strength of the likelihood of success on the merits is inversely proportional to the amount of irreparable harm that will be suffered if an injunction does not issue. *Baker v. Adams County/Ohio Valley School Bd.*, 310 F.3d 927, 928 (6th Cir. 2002). However, it is critical that a plaintiff suffer some irreparable injury before injunctive relief may issue. *Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 104 (6th Cir. 1982); *Basicomputer Corp. v. Scott*, 791 F. Supp. 1280, 1285 (N.D. Ohio 1991), *aff'd*, 973 F.2d 507 (6th Cir. 1992); *Economou v. Physicians Weight Loss Ctrs. Of Am.*, 756 F. Supp. 1024, 1031 (N.D. Ohio 1991).

## 2. *The Operating Agreement and Non-Competition Agreements*

The Operating Agreement at issue in this case states that it shall be governed by, and

construed in accordance with, Ohio law. (ECF #18-1 [Operating Agreement, Hearing Ex. 1],

PageID #804, § 10.8). The Employment Agreements at issue in this case with respect to the

Employee Defendants is also governed by Ohio law. (ECF #18-2, PageID #809, 811, § 16

[Employment Agreement, contained within Hearing Ex. 2]). The Nondisclosure Agreements at

issue in this case with respect to the Employee Defendants is governed by Delaware law. (ECF

#18-2, Page ID #812, 815, § 7(a) [Nondisclosure Agreement, contained within Hearing Ex. 2]).

### B. <u>Application of the Law</u>

#### 1. *<u>Likelihood of Success on the Merits</u>*

The requirements for establishing misappropriation of trade secrets are substantially the

same under the Defend Trade Secrets Act ("DTSA") and the Ohio Uniform Trade Secrets Act

("OUTSA"). *Mesa Indus. v. Charter Indus. Supply, Inc.*, 2022 WL 1044720, at \*6 (S.D. Ohio

Apr. 7, 2022). "To prevail on a misappropriation of trade secrets claim, a plaintiff must show . . .

that: (1) a trade secret exists; (2) the defendants acquired the trade secret because of a confidential

relationship; and (3) the defendants used the trade secret without authorization." *Premier Dealer

Serv., Inc. v. Allegiance Administrators, LLC*, 2018 WL 5801283 (S.D. Ohio Nov. 6, 2018).

To succeed on a claim for breach of contract, a plaintiff must establish that "(1) a contract

existed, (2) one party fulfilled his obligations, (3) the other party failed to fulfill his obligations,

and (4) damages resulted from that failure." *Quest Workforce Solutions, L.L.C. v. Job1USA, Inc.*,

75 N.E.2d 1020, 1030 (Ohio Ct. App. 2016). The elements to establish breach of contract are the

same in both Delaware and Ohio. *See, e.g., Arwood v. AW Site Servs. LLC*, 2022 WL 705841, at

\*27 (Del. Chan. Ct. Mar. 9, 2022) ("To prevail on a breach of contract claim, a party must prove

the existence of a contractual obligation, the breach of that obligation, and resulting damages.").

While deciding a preliminary injunction motion requires a Court to consider and analyze whether Plaintiff has shown a likelihood of success on ultimately prevailing on their substantive claims, it is not a time for a district court to resolve "doubtful or difficult questions of law or disputed questions of fact." *Neveux v. Webcraft Techs.*, 921 F. Supp. 1568, 1572 (E.D. Mich. 1996) (citing *Int'l Molders' and Allied Workers' Local Union v. Nelson*, 799 F.2d 547, 551 (9th Cir. 1986)); *see also Sargent v. Am. Greetings Corp.*, 588 F. Supp. 912, 925 (N.D. Ohio 1984) (denying motion for preliminary injunction in part because genuine issues of material fact existed). At this stage of the case, it is not entirely clear what Collar Jobs' "trade secret" is. While Collar Jobs describes its providing of candidate names and limited contact information to Collar Diversified as incorporating a trade secret, Delta Diversified contends that what Collar Jobs provided in this regard was providing "a name, maybe an e-mail address, maybe a personal phone number, and usually a copy of a publicly-available LinkedIn profile," ((ECF #17 [Hearing Tr. 11/02/22], PageID #693 (*Stocum*)), all information that often can be gleaned from the internet or other public sources. At the hearing, Collar Jobs provided no testimony or evidence whatsoever demonstrating a proprietary means by which it gathers and "vets" such basic information before passing it along for the Collar Diversified employees to develop through phone calls, e-mails, texts, and other communications to create a profile for marketing candidates to employers identified by Delta Diversified through its contacts in the building technology industry. Collar Jobs' principal, Geoffrey Loree, admitted that the detailed candidate information ultimately developed on the Bullhorn operating system was Collar Diversified information.[9] (ECF #16

---

9

The Bullhorn operating system, while "customizable" by licensees, is itself a third-party product available to anyone. (*See* ECF #16 [Hearing Tr.11/01/22], PageID #383 (*Loree*) ("So Bullhorn is off the shelf, . . . that anybody can buy that system off the shelf")). The

[Hearing Tr. 11/01/22], PageID #480 (*Loree*)).  Collar Jobs also asserts that it's "trade secret" was a "platform" it provided to Collar Diversified to provide an "easy-to-use platform for people with limited or no recruiting experience, and it can do that by the use of systems data, automation, marketing, branding, and a combination of those things in order to help people who don't have any recruiting experience, or limited recruiting experience, ramp up quickly and be effective to compete with traditional recruiting firms."  (ECF #16 [Hearing Tr. 11/01/22], PageID #380-381 (*Loree*)).  Perhaps Collar Jobs has such a system, but so far it has produced no specific evidence of unique "systems data, automation, marketing, branding, [or] a combination of those things" supporting a finding of the existence of such a "trade secret" system.  These are matters for a jury to ultimately decide, or to be developed and shown in the normal course of discovery and, perhaps, motion practice.

At this stage of the litigation, Collar Jobs has not established a sufficient "likelihood of success" on its claims.  As to the claims purportedly brought "derivatively" on behalf of Collar Diversified, not only is there a serious question as to whether Collar Jobs can even assert such "derivative" claims (given no consent being given by equal partner Delta Diversified), there is also, so far, no evidence that any information has been "taken" from Collar Diversified or used outside the confines of the Collar Diversified business operation.

As to the trade secrets claims, a sufficient "likelihood of success" has not been shown weighing in favor of granting a preliminary injunction.

These same considerations apply to the breach of contract claims.  While each of the

---

evidence produced at the hearing demonstrated that the "custom information" added to the Bullhorn system over the course of Collar Diversified's employees working with the candidates was Collar Diversified's information.

employees signed employment agreements and nondisclosure agreements, and the Operating

Agreement governing Collar Diversified contains confidentiality provisions (*see, e.g*, ECF #18-1

[Operating Agreement, § 10.3]), so far, no evidence has been produced showing that anyone has

"divulge[d], communicate[d], or use[d]" confidential Collar Diversified information "to the

detriment of the Company," (*Id.*), outside the business operations of Collar Diversified.  And, as

earlier noted, *both* Collar Jobs and Delta Diversified have taken numerous actions "on behalf of

Collar Diversified" without obtaining the written consent of the other.

At this stage, a "likelihood of success" on the contract claims also falls below a standard

warranting injunctive relief.

### 2. *Irreparable Harm*

At the hearing, it was shown that each of the employees who testified had signed a

nondisclosure agreement containing a provision whereby they contractually consented to the entry

of equitable relief in the event of a breach of the confidentiality or other provisions of the

nondisclosure agreement, (ECF #16 [Hearing Tr. 11/01/22], PageID #525-526 (*Burke*); *Id.*,

PageID #552 (*Rakich*)),[10] based on Section 7(b) of the nondisclosure agreement, which provides:

> **Equitable Relief.**  The parties acknowledge that a breach of this agreement will cause
> irreparable harm to the Disclosing Party and monetary damages may not be a
> sufficient remedy for an unauthorized disclosure of te Confidential Information.  If a
> receiving Party discloses the Confidential Information in violation of this agreement,
> a Disclosing Party may, without waiving any other rights or remedies and without
> posing a bond or other security, seek an injunction, specific performance, or other
> equitable remedy to prevent competition or further disclosure, and may pursue other
> legal remedies.

---

[10] There was evidence that employee Sean Hyde had not been required to sign an employment
agreement or a nondisclosure agreement.  (ECF #16 [Hearing Tr. 11/01/22], PageID #575
(*Hyde*)).

(ECF #18-2 [Hearing Ex. 2], PageID #815 (Welcome Package, Nondisclosure Agreement, § 7(b)).

But the analysis of "irreparable harm" does not end there. Under Ohio law, courts have held that "a provision in a noncompetition agreement that contains a stipulation that any violation of the agreement would create irreparable injury is insufficient to establish irreparable injury, because 'actual injury is not presumed. It must be proved.'" *TGR Enters., Inc. v. Kozhev*, 167 Ohio App. 3d 29, 38, 853 N.E.2d 739, 746 (Ohio Ct. App. 2006) (quoting *Patio Enclosures, Inc. v. Herbst*, 39 Fed. Appx. 964, 970 (6th Cir. 2002)). Whether irreparable injury occurred is a mixed question of law and fact to be determined by the court, . . . and cannot be resolved by mere stipulation of fact. *Id.* The same standard applies in federal court. "The law does not presume injury and requires proof of harm, even where a contract provides otherwise." *PFG Ventures, L.P. v. Kennedy*, 2022 WL 2900713, *10 (N.D. Ohio July 22, 2002).

While a district court balances a number of factors in determining whether to grant injunctive relief, "[t]he basis of injunctive relief in the federal courts has always been irreparable harm and the inadequacy of legal remedies." *Sampson v. Murray*, 415 U.S. 61, 88 (1974). As stated earlier, it is critical that a plaintiff suffer *some* irreparable injury before injunctive relief may issue. *Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 104 (6th Cir. 1982); *Basicomputer Corp. v. Scott*, 791 F. Supp. 1280, 1285 (N.D. Ohio 1991), *aff'd*, 973 F.2d 507 (6th Cir. 1992); *Economou v. Physicians Weight Loss Ctrs. Of Am.*, 756 F. Supp. 1024, 1031 (N.D. Ohio 1991). Here, the Court has been presented with no evidence of "irreparable harm." Each of the witnesses at the hearing testified, credibly, that they never shared any information claimed to be "trade secret" (whether owned by Collar Jobs or Collar Diversified), outside the context of their continuing business practices *within* Collar Diversified – including Collar Diversified

business analyst Sean Hyde's gathering of information from the Bullhorn operating system to prepare reports for use *within* Collar Diversified, or his e-mailing of a copy of his regularly-prepared spreadsheet to an e-mail account not controlled by Collar Jobs to prevent disruption of his regular employment tasks *within* Collar Diversified after the earlier unilateral shutdown of the Bullhorn system by Collar Jobs. All of the witnesses testified, again credibly, that they never competed in any way with Collar Diversified by using information outside the context of their Collar Diversified employment. Finally, the testimony and evidence presented so far supports a finding that "Collar Talent" is simply a continuation Collar Diversified, still owned in 50% share by Collar Jobs, and that all of the Collar Diversified employees' activities were, and are, taken solely on behalf, and to the sole benefit, of Collar Diversified.

At present, there has been no showing of "irreparable harm" that could not be addressed by damages if Plaintiff Collar Jobs were to ultimately establish its claims at trial (such as, if warranted, recovery of the "subscription fees" it no longer receives). This factor does not weigh in favor of granting injunctive relief.

### 3. *Substantial Harm to Others*

Plaintiff Collar Jobs seems to predicate its "substantial harm to others" argument on confusion in the marketplace regarding whether "Collar Talent" is "Collar Diversified." It has produced no evidence of such confusion. It points to one Collar Jobs employee being told by a Collar Diversified client that he (the client) was "still connected" with Collar Diversified hiring specialist Christina Rakich and that the client had been provided with Christina Rakich's new e-mail address. (ECF #18-8 [Hearing Ex. 11], PageID #862). As described earlier, the e-mail referred to is the e-mail Rakich uses in her continuing role with Collar Diversified. This does not

establish "confusion."

On the other hand, granting injunctive relief at this stage, to effectively shut down the continuing operation of Collar Diversified, whether marketed as "Collar Diversified" or "Collar Talent" while remaining the same company as it always has been, would effectively put the nine Collar Diversified employees out of work.

This factor clearly does not favor the grant of injunctive relief.

### 4. *Public Interest*

Neither party put forward any evidence on the "public interest" factor. Accordingly, it does not enter into the analysis, other than by its failure to have an effect.

## IV. CONCLUSION

For the reasons set forth above, Plaintiffs' motion for a preliminary injunction is DENIED. Barring any change in the existing posture or status of the case that may later warrant immediate injunctive relief, which conditions are not currently present, the case can proceed as a civil matter toward trial in the normal course.

A pretrial status conference is hereby set for Tuesday, December 20, 2022, at 9:30 am, to be held telephonically before the Court. Counsel are instructed to first initiate a conference call

with all parties connected, and then contact the Court.

      IT IS SO ORDERED.


                                          _____
                                          DONALD C. NUGENT
                                          United States District Judge


DATED: November 30, 2022