**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **COLLAR JOBS, LLC, et al.,** | ) | **CASE NO.  1:22-CV-1892** |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **JUDGE DONALD C. NUGENT** |
| | ) | |
| **BENJAMIN STOCUM, et al.,** | ) | |
| | ) | **MEMORANDUM OF OPINION** |
| **Defendants.** | ) | |

## I.  INTRODUCTION

This matter is now before the Court on three motions for summary judgment, each filed

on October 2, 2023, specifically:  (1) *Defendants' Motion for Summary Judgment* (ECF #65); (2)

*Counterclaim Defendant Collar Jobs, LLC's Motion for Summary Judgment* (ECF #66); and (3)

*Third-Party Defendant Geoffrey Loree's Motion for Summary Judgment* (ECF #68).  All three

summary judgment motions are now fully briefed and are ready for ruling by the Court.[1]

With respect to the determinative facts and events of this case, the parties seem to agree

on essentially nothing.  Subsequent discovery by the parties has not materially changed any

---

[1]

For purposes of the record, the ECF Docket entries related to the summary judgment
motions are:  (1) *Defendants' Motion*:  ECF #65, #82, and #85; (2) *Counterclaim Defendant
Collar Jobs' Motion*:  ECF #66, #79, and #86; and (3) *Third-Party Defendant Geoffrey Loree's
Motion*:  ECF #68, #80, and #84.

party's presentation of the operative facts.  The same fact questions existing at the outset of this case remain at issue after the extensive summary judgment briefing.

Given the fundamental differences in the parties' view as to what the *actual facts* of the case are, on November 27, 2023, the Court took the uncommon step of hearing oral argument in open court to allow each party to present its summary judgment positions.  The hearing only fortified the Court's belief that none of the factual issues underlying the claims presented are ones properly decided by a motion for summary judgment.  Accordingly, each of the parties motions for summary judgment – *Defendants' Motion for Summary Judgment* (ECF #65); *Counterclaim Defendant Collar Jobs, LLC's Motion for Summary Judgment* (ECF #66); and *Third-Party Defendant Geoffrey Loree's Motion for Summary Judgment* (ECF #68), are DENIED in their entirety.

A jury trial, on all claims presented in the *Verified Complaint* (ECF #1) and *Defendants' Counterclaim and Third-Party Complaint* (ECF #11), is hereby set for Monday, January 29, 2024, to begin at 8:30 am, in Courtroom 15A.

## II.  **FACTS**

The factual recitation provided here is drawn primarily from this Court's earlier *Memorandum of Opinion*, issued on November 30, 2022 (ECF #34), in connection with Plaintiff Collar Jobs' motion for preliminary injunction (ECF #1, included as Count XV of the *Verified Complaint*, PageID # 39-40) after a two-day hearing held before the Court on November 1 and 2, 2022.

### A.  **The Parties**

Plaintiff Collar Jobs, LLC ("Collar Jobs") is an entity 100% owned by Park Resilience Holdings, LLC ("Park Resilience").  Park Resilience, in turn, is 100% owned by Collar Jobs'

(and Park Resilience's) principal Geoffrey Loree ("Loree").  (ECF #16, *Hearing Tr. 11/01/22*, PageID #379-380 (*Loree*)).[2]

Named Plaintiff Collar Diversified, LLC ("Collar Diversified") is a joint venture between Plaintiff Collar Jobs and Defendant Delta Diversified, Inc. ("Delta Diversified"), with each joint venture partner owning a 50% share of Collar Diversified.  (ECF #16, *Hearing Tr. 11/01/22*, PageID #379-380 (*Loree*); ECF #17, *Hearing Tr. 11/02/22*, PageID #598 (*Stocum*)).[3]

The Defendants are Delta Diversified, Benjamin Stocum ("Stocum"), who owns the controlling interest of Delta Diversified, and seven employees of Collar Diversified, Cheryl Pearson, Christina Rakich, Regina Ziccardi, Abigail Burke, Cassidy Czikray, Madison Lewis, and Sean Hyde, all of whom are Ohio residents.[4]

---

[2]

At the preliminary injunction hearing, Loree testified to being the 100% owner of Collar Jobs by virtue of being the 100% owner of Park Resilience:  "I am personally a hundred percent owner of Park Resilience Holdings, which owns a hundred percent of Collar Jobs, and Collar Jobs owns 50 percent of Collar Diversified.  (ECF #16, *Hearing Tr. 11/01/22*, PageID #379-380).  In response to later discovery, Collar Jobs noted that, from October 2018 through June 2019, Geoffrey Loree owned 80% of Park Resilience, and that his son Gabe Loree owned 20%.  The same discovery response noted that, from January 2019 through June 2019, Driftwood Grove LLC owned 10% of Collar Jobs (the ownership of Driftwood Grove is not identified) (*See* ECF #68-10, PageID #2061).  The Court notes that these other ownership percentages predate the pertinent time period for the claims at issue in this case, which began with the initiation of a "test period" for "Collar Diversified" begun in the Fall of 2019.  (*See* ECF #16, *Hearing Tr. 11/01/22*, PageID #388 (*Loree*)).

[3]

In addition to on its own behalf, Plaintiff Collar Jobs purportedly filed the *Verified Complaint* "derivatively" on behalf of the Collar Diversified joint venture partnership under the provisions of Ohio Revised Code §§ 1706.61-1706.617.  (ECF #1).  Defendants dispute the assertion that Collar Diversified is a proper party plaintiff in the case.  (ECF #11, PageID #29, ¶ 9).  For the purposes of this *Memorandum of Opinion*, the Court will refer to Plaintiff singularly as Collar Jobs, except as where necessary to accurately describe the asserted claims of the *Verified Complaint*.

[4]

The employee Defendants are actually payroll employees of Delta Diversified, (*see* ECF

B. **The Claims**

The facts of this case relate to the formation and the ongoing activities of Collar Diversified, the Operating Agreement under which Collar Diversified is managed and governed, the duties and obligations of the Operating Agreement, and the duties and obligations of Employee Agreements and Nondisclosure Agreements entered into by the Employees.

Plaintiffs' complaint asserted fifteen claims:

**Count I**:  Misappropriation of Trade Secrets (on behalf of Collar Jobs against all Defendants under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*);

**Count II**:  Misappropriation of Trade Secrets (on behalf of Collar Jobs against all Defendants under the Ohio Uniform trade Secrets Act, Ohio Rev. Code § 1333.61, *et seq.*);

**Count III**:  Misappropriation of Trade Secrets (on behalf of Collar Diversified against all Defendants under the Defend Trade Secrets Act);

**Count IV**:  Misappropriation of Trade Secrets (on behalf of Collar Diversified against all Defendants under the Ohio Uniform trade Secrets Act);

**Count V**:  Breach of the Operating Agreement (on behalf of Collar Jobs against Delta Diversified);

**Count VI**:  Breach of the Operating Agreement (on behalf of Collar Diversified against Delta Diversified);

**Count VII**:  Breach of Fiduciary Duty (on behalf of Collar Jobs against Delta Diversified);

**Count VIII**:  Breach of Fiduciary Duty (on behalf of Collar Diversified against Delta Diversified);

---

#65-2, *Stocum Dep.*, PageID #1629), but the assertions of the *Verified Complaint* relate to their services performed in their respective roles as Collar Diversified employees.  There were initially nine individual employee Defendants (ECF #1).  On May 16, 2023, all parties moved jointly to dismiss Defendants Cullen Barelka and Emily Slak, per *Joint Stipulation of Voluntary Dismissal Without Prejudice* (ECF #51).  The motion was granted on May 17, 2023 (ECF #52).

**Count IX**:  Breach of Noncompete Obligations (on behalf of Collar Diversified against Employees);

**Count X**:  Breach of Nondisclosure Obligation (on behalf of Collar Jobs against Employees);

**Count XI**:  Tortious Interference With Contractual Relationship (on behalf of Collar Diversified against Defendants Stocum and Delta Diversified);

**Count XII**:  Tortious Interference With Contractual Relationship (on behalf of Collar Jobs against Defendants Stocum and Delta Diversified);

**Count XIII**:  Conversion (on behalf of Collar Jobs against all Defendants);

**Count XIV**:  Conversion (on behalf of Collar Diversified against all Defendants).

(ECF #1, *Verified Complaint*, PageID #24-38, ¶¶ 129-222).[5]

After the filing of the *Verified Complaint* (ECF #1), Defendants responded with their own filing, *Defendants' Answer to Plaintiffs' Complaint, Counterclaim, and Third Party Complaint.*  (ECF #11).  Defendants' counterclaims against Plaintiff Collar Jobs asserted:

**Count I**:  Fraud (on behalf of Delta Diversified and Stocum against Collar Jobs);

**Count II**:  Fraudulent Inducement (on behalf of Delta Diversified and Stocum against Collar Jobs);

**Count III**:  Breach of Contract (on behalf of Delta Diversified and Stocum against Collar Jobs);

**Count IV**:  Breach of Fiduciary Duties (on behalf of Delta Diversified and Stocum against Collar Jobs).

(ECF #11, PageID #315-324, ¶¶ 1-78).

---

[5]   The *Verified Complaint* included a Count XV, seeking entry of a preliminary and permanent injunction.  (ECF #1, *Verified Complaint*, PageID #39-40, ¶¶ 223-228). The motion for preliminary injunction was denied after a two-day hearing, pursuant to this Court's *Memorandum of Opinion* and *Order*, each dated November 30, 2022 (ECF #34 & #35).

Defendants' third-party complaint asserted claims against Geoffrey Loree, who owns and operates Plaintiff Collar Jobs through Park Resilience, alleging:

> **Count I**:  Fraud (on behalf of Delta Diversified and Stocum against Loree);
>
> **Count II**:  Fraudulent Inducement (on behalf of Delta Diversified and Stocum against Loree);
>
> **Count III**:  Breach of Contract (on behalf of Delta Diversified and Stocum against Loree);
>
> **Count IV**:  Breach of Fiduciary Duties (on behalf of Delta Diversified and Stocum against Loree).

(ECF #11, PageID #325-326, ¶¶ 1-11).

## C. <u>Pertinent Facts and Events</u>

In May, 2020, Collar Jobs and Delta Diversified created a joint venture business arrangement, to be called "Collar Diversified, LLC."  (ECF #18-1, *Operating Agreement, Hearing Ex. 1*, PageID #792]).  Each of the joint venture partners, Collar Jobs and Delta Diversified, owns a 50% share (ECF #16, *Hearing Tr. 11/01/22*, PageID #379-380 (*Loree*); ECF #17, *Hearing Tr. 11/02/22*, PageID #598 (*Stocum*)).  The governing document by which Collar Diversified was created and thereafter operated was the "Operating Agreement of Collar Diversified, LLC."  (ECF #18-1, *Operating Agreement, Hearing Ex. 1*, PageID #792-806).  While not explicitly stated in the Operating Agreement, the basic purpose of Collar Diversified was to match persons in the building technologies industry seeking new jobs with employers in the building technologies industry seeking new talent.  (*See*, *e.g.*, *Hearing Ex. F* [Page from "Collar" website describing various "Collar" entities]) ("Collar Diversified: The #1 *on-demand* hiring platform for the Building Technologies industry") (emphasis in original).  Essentially, Collar Diversified was a recruiting firm identifying persons in the building technology industry

-6-

seeking new positions in the marketplace and working with them to find new positions with employers looking to fill positions.

The basic process by which this would work is that: (1) Collar Jobs would identify names of prospective candidates looking for new employment in the building technology industry and e-mail those names to hiring specialists working at Collar Diversified; then (2) the hiring specialists, over the course of many months, would communicate with the candidates to obtain an array of information regarding the candidate's experience and enter the information and various notes onto a third-party database purchased by Collar Jobs called "Bullhorn"; and then (3) that information would be used throughout the representation to assist the Collar Diversified hiring specialists in placing the candidates with employers drawn from Delta Diversified's longtime client list of employers seeking new talent. (*See*, *e.g*, ECF #16, *Hearing Tr. 11/02/22*, PageID #561-562 (*Rakich*) (describing general process); *Id*, PageID #587 (*Hyde*) (same)).

The Operating Agreement contains no specific description of the exact roles of Collar Jobs and Delta Diversified, (*see* ECF #18-1, *Operating Agreement, Hearing Ex. 1*), within the business plan of Collar Diversified. In practice, Collar Jobs' primary role was to identify potential candidates seeking new positions within the industry, and Delta Diversified's primary role was to draw on its longstanding presence and contacts within the employment recruiting field to identify business technology employers seeking to fill positions. Not surprisingly, the parties' have, throughout this case, described their respective roles rather differently.

Collar Jobs describes its role as assembling data offline and online to identify persons who were interested in new employment, verifying that the person identified was real and had an interest in new job opportunities, vetting the person identified as a "lead" to make sure they were

appropriate for open positions, inputting the candidate information into a third-party licensed database called "Bullhorn," then passing on that "hot lead" to the hiring specialists at Collar Diversified to work with the candidates using a proprietary "workflow system" developed solely by Collar Jobs to allow the candidates to proceed toward finding employment.  (ECF #16, *Hearing Tr. 11/01/22*, PageID #395-396 (*Loree*)).  It is this "workflow system" that Collar Jobs asserts is a proprietary "trade secret."  Collar Jobs describes Delta Diversified's role as "provid[ing] the cash flow for the personnel, . . . provid[ing] managerial and administrative duties related to the business[,] and br[inging] some traditional recruiting experience" to the joint venture.  (ECF #16, *Hearing Tr. 11/01/22*, PageID #393 (*Loree*)).  Collar Jobs also states that its contributions included "the brand, the logo, marketing, advertising, and website."  (ECF #16, *Hearing Tr. 11/01/22*, PageID #394 (*Loree*)).

Delta Diversified, on the other hand, describes the "hot leads" provided by Collar Jobs to Collar Diversified (though a payment of a monthly "subscription fee" paid by Collar Diversified to Collar Jobs) as not "trade secret" information, but rather, essentially, little more than "a name, maybe an e-mail address, maybe a personal phone number, and usually a copy of a publicly-available LinkedIn profile, ."  (ECF #17, *Hearing Tr. 11/02/22*, PageID #693 (*Stocum*)).  Even now, after the completion of discovery and the filing of the summary judgment pleadings with reference to numerous exchanged documents, specific identification of the Collar Jobs "trade secrets" within the "hot leads" information remains a somewhat elusive concept, but there is *some* evidence in the record (described in greater detail in the analysis portion of this *Memorandum of Opinion*) supporting the possibility that various elements of Collar Jobs' product was gathered and created from non-public channels and tailored to specific employment openings by Collar Jobs.

Delta Diversified states that the process used by the Collar Diversified hiring specialists to work with the client job-seekers was a "workflow system" that was developed *jointly* by everyone at Collar Diversified, and was primarily based on a "workflow system" that Delta Diversified had been using for over 20 years recruiting in the business technology industry.  (*See*, *e.g.*, ECF #17, *Hearing Tr. 11/02/22*, PageID #693 (*Stocum*) (describing that after Collar Diversified received the name, e-mail address, phone number, and LinkedIn profile from Collar Jobs through the paid-for subscription, "then, the system that Collar Diversified runs then kicks in and starts updating the data, appending that data[;] we would make no placements if it weren't for all of those personnel that you saw yesterday [Collar Diversified employees Burke, Rakich, and Hyde] taking the lead and then turning that into a candidate that can be marketed[;] and then, they have to follow up on the marketed material with the employers and find out who would like to take interviews, answer additional questions[;] and then all of that information continues to get stored in the database as well")); (*see also* ECF #17, *Hearing Tr. 11/02/22*, PageID #650-651 (*Stocum*) ("[T]he workflow that's being claimed as Collar Jobs' proprietary information is at – that is not accurate.  The workflow that we use at – for working in the Collar Diversified, you know, business was created by the combined efforts of Geoff [Loree], Cheryl Pearson, Madison Lewis, all of our joint collaborative experiences.  We have adapted how we use data, what key pieces of data we keep track of.  If you did a – I'm sure that if you looked at a change log in Bullhorn, you would see how many different changes occurred from the time we started using it for Collar Diversified business and today.  That is a workflow and those are systems that were created as a joint collaborative effort for the people working on behalf of Collar Diversified.")).

Delta Diversified describes the role and value Delta Diversified brought to the table as:

[T]he entire business of Collar Diversified was built off the backbone of Delta

-9-

Diversified's 20 years of experience working in that specific industry with those specific clients.  And what Collar Diversified was formed to do, because Geoff [Loree] did have a valuable approach, was identifying very specific types of candidates that we weren't fulfilling searches for at Delta Diversified.

That's why Delta provided the clients [seeking to fill positions], the know-how, the workflow, the process of turning leads into money, but there was a gap in what with we were able to provide our clients and that's what Collar Diversified filled at its outset.

(ECF #17, *Hearing Tr. 11/02/22*, PageID #610 (*Stocum*)).

At the time of the filing of the *Verified Complaint*, there were nine persons employed to represent Collar Diversified in the marketplace: Cheryl Pearson, Cassidy Czikray, Christina Rakich, Madison Lewis, Abigail Burke, Regina Ziccardi, Cullen Berelka, Emily Slak, and Sean Hyde.  (ECF #17, *Hearing Tr. 11/02/22*, PageID #643 (*Stocum*)).  While each of these persons worked on behalf of Collar Diversified, they were each in fact employees of Delta Diversified (ECF #17, *Hearing Tr. 11/02/22*, PageID #602 (*Stocum*)): their checks are paid by Delta Diversified (*Id.*, PageID #605); the federal tax forms related to their employment (I-9s/W-9s) list them as employees of Delta Diversified (*Id.*); the State of Ohio recognizes them as employees of Delta Diversified (*Id.*); and while their Employment Agreements say "Collar Diversified LLC" on the first page, they are signed on behalf of the "Company" (identified in the opening paragraph as "Collar Diversified, Inc.") by Delta Diversified and its CEO (who is not a Collar Diversified LLC employee) James Hyde.  (ECF #18-2, *Welcome Package, Hearing Ex. 2*, PageID #809-811).  In addition to the Employment Agreements, each of the employees (with the possible exception of Sean Hyde) signed Nondisclosure Agreements between themselves and Collar Jobs.  (ECF #18-2, *Welcome Package, Hearing Ex. 2*, PageID #812-816).[6]

---

[6]

Sean Hyde testified that he never signed either an Employment Agreement or a

Over the course of the first 29 months of Collar Diversified's existence (from its inception in May 2020 through mid-October 2022), Collar Jobs had been paid a total of $968,950.00 in "subscription fees" out of the assets of Collar Diversified.  (ECF #18-3, *Profit & Loss Statement, Hearing Ex. 3*, PageID #852).  As of this same time-frame, Delta Diversified, which incurred 100% of the operating expenses of Collar Diversified (including the payment of salaries), for which it was to be paid a monthly "shared services" amount, had not actually been paid anything out of the sums earned by Collar Diversified, but was rather owed $279,269.04 in shared services fees.  (ECF #18-23, *Collar Diversified LLC Balance Sheet, Hearing Ex. B*, PageID #977).

It is this next asserted "fact" – *different versions of which are offered by the parties* – that forms a central element of much of this case.  Testimony initially introduced at the preliminary injunction hearing, and supported later in the evidence presented in the summary judgment pleadings, indicated that, in late August or early September 2022, Collar Jobs' principal Geoffrey Loree, saying that "he had to make more money and he needed to focus on other things in his life," informed Delta Diversified principal Benjamin Stocum that "he wasn't going to be coming in and being part of the day-to-day operations" of Collar Diversified, and that he "didn't care if we [Collar Diversified] continued paying the subscription payment."  (ECF #17, *Hearing Tr. 11/02/22*, PageID #614-615 (*Stocum*); *see also Id.*, PageID #616, 627, 637, 667, 672, 675, 700; ECF #16, *Hearing Tr. 11/01/22*, PageID #219-220 (*Hyde*)).  Both at the hearing, and now in his deposition testimony and an interrogatory response (identified at the summary judgment hearing, but not submitted as part of the summary judgment exhibits), Loree flatly denies that he told

---

Nondisclosure Agreement.  (ECF #16, *Hearing Tr. 11/01/22*, PageID #575).

-11-

Stocum in August or September that he did not want to be involved in the company anymore, (ECF #16, *Hearing Tr. 11/01/22*, PageID #405, 455 (*Loree*); ECF #81-1, *Loree Dep . Tr.*, PageID #2353-2355), but at the preliminary injunction hearing he admitted that he had not been in the office at any time after the first week of September 2022, and that he was never "regularly active in the day-to-day in the office."  (*Id.*, PageID #457).

On September 18, 2022, Collar Jobs principal Geoffrey Loree sent an e-mail to Madison Lewis, whose job includes branding work for the joint venture, (ECF #17, *Hearing Tr. 11/02/22*, PageID #697 (*Stocum*)), instituting a new policy asking that everyone henceforth be identified as "Title at Collar Diversified," and that all the branding on the joint venture's LinkedIn and internet references (which sites were housed on accounts controlled by Collar Jobs, ECF #16, *Hearing Tr. 11/01/22*, PageID #394-395 (*Loree*)), should now show a newly-created "Collar Diversified" logo and be titled "Collar Diversified."  (ECF #18-12, *Hearing Ex. 16*, PageID #868; ECF #18-24, *Hearing Ex. D*, PageID #979-980).  Prior to sending this e-mail, Loree had not communicated anything to Delta Diversified principal Benjamin Stocum about the new brand change, in writing or otherwise.  (*See* ECF #16, *Hearing Tr. 11/01/22*, PageID #497-498 (*Stocum*)).  While Stocum later sent an e-mail to Madison Lewis consenting to the unilateral branding changes, the hearing testimony indicated that, after consulting with others, he decided to just let the changes "go forward."  (ECF #17, *Hearing Tr. 11/02/22*, PageID #662-663 (*Stocum*) ("I did not approve [the branding changes] with discussion.  He [Loree] forced it out. And from a standpoint of maintaining – I didn't want to create more friction with the team, so I said go ahead, go forward with this. . . .  After Geoff [Loree] forced that brand change through Madison Lewis and didn't copy me, didn't discuss it with me, after he just unilaterally directed her, I had some counsel with one of my business partners, and then I responded to the message

-12-

and I said go ahead, go forward.")).  At the November 2022 preliminary injunction hearing, a number of witnesses testified that for all of the existence of the joint venture – before any purported "brand change" or otherwise – and to this day – employees would refer to themselves in communications with clients as simply "Collar" rather than "Collar Diversified" or "Collar Talent."  (*See*, *e.g.*, ECF #16, *Hearing Tr. 11/01/22*, PageID #534-535 (*Burke*), PageID #559-560 (*Rakich*), PageID #579-580 (*Hyde*); ECF #17, *Hearing Tr. 11/02/22*, PageID #631-632 (*Stocum*)).  There was also testimony presented at the preliminary injunction hearing that the logo that was ultimately instituted for Collar Diversified was essentially a stock image available on the internet, (ECF #16, *Hearing Tr. 11/01/22*, PageID #132 (*Loree*); *see also Hearing Ex. C* [Internet page showing "Collar Logo HD Stock Images"]), and that it was never registered with the State of Ohio as a proprietary mark.  (ECF #16, *Hearing Tr. 11/01/22*, PageID #132 (*Loree*)).

A few days earlier, on September 12, 2022, stating that he had seen an unauthorized "data breach" on the Bullhorn database based on a perceived "abnormal amount of page hits," Geoffrey Loree, and his son Gabe Loree, unilaterally shut down the Bullhorn system such that none of the Collar Diversified employees (including not only the hiring specialists, but also business analyst Sean Hyde and Delta Diversified principal Benjamin Stocum) could access it. (ECF #18-4, *Hearing Ex. 4* [E-mail string between Gabe Loree and "Team"]; *see also* ECF #16, *Hearing Tr. 11/01/22*, PageID #409-411 (*Loree*); ECF #17, *Hearing Tr. 11/02/22*, PageID #662 (*Stocum*)).  Later that day – approximately two hours later with respect to the hiring specialists and approximately five hours later with respect to Stocum and Hyde – the Bullhorn system went back online.  (ECF #16, *Hearing Tr. 11/01/22*, PageID #411 (*Loree*)).  Testimony introduced at the preliminary injunction hearing indicated that the high volume of "hits" on the Bullhorn system were likely the result of Collar Diversified business analyst Sean Hyde accessing the

-13-

system to create a manually-created spreadsheet showing the business activity of each of the hiring specialists.  (Hearing Ex. 8; *see also* ECF #16, *Hearing Tr. 11/01/22*, PageID #568-572 (*Hyde*)).  Other testimony introduced at the preliminary injunction hearing indicated that Hyde had regular communications with Loree throughout the entire time Collar Diversified existed, (ECF #16, *Hearing Tr. 11/01/22*, PageID #568 (*Hyde*)), and that he regularly created such spreadsheets "outside of the database" (in effect, not created by an operational function of the Bullhorn database) based off of information within the database (*Id*).  Hyde testified on a number of occasions that he did this regularly, and that it was "part of his job."  (ECF #16, *Hearing Tr. 11/01/22*, PageID #584, 585, 586, 588, 591; *see also* ECF #17, *Hearing Tr. 11/02/22*, PageID #645, 646, 713, 714 (*Stocum*) (describing Hyde's preparation of spreadsheets from data found on Bullhorn as "that was his job")).  Hyde later testified that on September 30, 2002, he had e-mailed a copy of the spreadsheet identified as Hearing Exhibit 8, which he had been putting together "for months to do my job," (ECF #16, *Hearing Tr. 11/01/22*, PageID #591 (*Hyde*)), to his home e-mail address in anticipation that Geoffrey Loree might shut off the Bullhorn system again, as he had done approximately two weeks earlier.  (ECF #16, *Hearing Tr. 11/01/22*, PageID #583 (*Hyde*)).  Later evidence produced by Collar Jobs in response to a Request for Production, and included as an exhibit to Delta Diversified's summary judgment motion (and which Loree had in his possession on September 12, 2002), indicated that the "high volume of hits" report was due to an error with Bullhorn and not the result of a "data breach."  (*See* ECF #65-5, PageID #1726-1729).

At the preliminary injunction hearing, Benjamin Stocum testified that, on September 30, 2022, in response to his conversations with Geoffrey Loree about Loree wanting to focus on other things, and in light of the unilateral shutdown of the Bullhorn system, he sent an e-mail to

-14-

Loree stating:

> Geoff,
>
> I would like to buy the following:
>
> > • 1% of Collar Diversified from you
> > • A replicate of our Bullhorn database under my administrative control
> > • The collardiversified.com domain name
> > • Archived emails from Collar Diversified operations from start to present
>
> I have directed Jim [Hyde, CEO of Delta Diversified] to hold off on any financial transfers, until we figure out whether or not we can come to terms.
>
> Regards,
> Benjamin Stocum – President

(ECF #18-4, *Hearing Ex. 5*, PageID #853).

Stocum testified that the reason he made the offer to formally purchase a controlling interest in the joint venture was to provide continuity with the business.  (ECF #17, *Hearing Tr. 11/02/22*, PageID #748 (*Stocum*)).  He also testified that part of his motivation was also a perceived "friction" developing in the operation based on accusations about "unauthorized access" to the Bullhorn operating system and Loree's unilateral shutting down of the system:

> I recognized, when Geoff advised me that he was no longer interested in being part of the day-to-day operations, I recognized that – and he also explained that he needed – I need to make more money.  It doesn't – it was very clear to me with some of the other things that happened from that conversation, the kind of disconnecting the database, the kind of accusations, of some improper behavior with Sean, the back-channel communications that were happening with other employees, all of that had been swirling around the office, it was obvious that the status quo, as far as how Geoff and I were organized or how the business was organized under the operating agreement, it didn't – it didn't feel like this was going to be effective.
>
> * * *
>
> And at the same time, there were direct communications between Geoff and other employees that were coming back to me, the employees, Madison, Cheryl – so Madison Lewis, Cheryl Pearson, and Christina Rakich were all coming back to

-15-

me saying, hey, Geoff's asking these kind of questions.  And Cheryl was saying Geoff's accusing Sean of – of doing things that are improper and he – she felt very much like it was all – it felt very concerning. And everybody was very – it was all this very suspicious stuff.  Cheryl would share that kind of feedback from the conversations she had with Geoff, she would share it with me and she would share it with Jim Hyde, who is Sean's dad.

The environment was really tense and very suspicious and it wasn't healthy.  It just wasn't healthy.  And all I was trying to do was I wanted the business – I wanted the business to be able to continue operating.  I wanted to kind of depressurize things, eliminate friction, and let these young professionals operate in a functional way.

(ECF #17, *Hearing Tr. 11/02/22*, PageID #744-748 (*Stocum*) (cleaned up to eliminate repeated use of the words "you know")).

In response to Stocum's communication about buying a controlling interest in Collar Diversified, on October 7, 2022, Loree replied to Stocum, "If you would like to buy the entire stake that Collar Jobs owns, we'd be obliged to consider that."  (ECF #16, *Hearing Tr. 11/01/22*, PageID #416 (*Loree*); *see also* ECF #17, *Hearing Tr. 11/02/22*, PageID #745 (*Stocum*)).  At 2:09 pm the same date, Loree sent Stocum an e-mail stating that he had, again, unilaterally shut down the Bullhorn operating system:

Benjamin,

We have encountered another significant breach of terms and data.  However, this time we believe we have identified those in violation.  We have currently suspended the platform while we work with our technical team and partners to try and get back up and running and identify the extent of the damage.

Additionally, I am in contact with counsel and the authorities.

Regards,

Geoffrey P. Loree
*Founder*
Collar

(ECF #18-5, *Hearing Ex. 6*, PageID #856).

-16-

Afterward, at 2:20 pm the same day, Stocum sent Loree the following e-mail:

> I encourage you to relax and communicate with me on a more open and prompt basis. I continue to view you and Gabe as business partners in our 50/50 venture. There has been no activity that requires counsel and/or authorities. I notified you last week that we were no longer transferring funds. There are changes being made that are in the best interest of Collar Diversified LLC, which we both own. I have taken no action that is outside of the historical standards we've set in the past couple of years.
>
> I have my hands full right now, but I will speak with you later this afternoon, if you want.
>
> Regards,
> Benjamin

(ECF #18-5, *Hearing Ex. 6*, PageID #855).

The referenced "changes being made" to Collar Diversified was that Stocum had been undergoing efforts to create new imaging, a new website, new web addresses, a new LinkedIn site, new e-mail addresses, and new phone numbers for Collar Diversified within his administrative control, which he stated he had done in response to Loree saying he no longer wanted to be involved in the day-to-day business of the joint venture. (ECF #16, *Hearing Tr. 11/01/22*, PageID #619-620 (*Stocum*); *see also*, *generally* ECF #18-17, *Hearing Ex. 23* (collected e-mails between Benjamin Stocum and The Karcher Group (TKG) regarding changes to website imaging), *and specifically*, PageID #955 referencing the desire to have branding ability not unilaterally controlled by Collar Jobs, "Our company name is Collar Diversified LLC, but the imaging that you see here is 'owned' by Collar Jobs LLC, which I have no control over. My objective is to set up properties that I have the control of")).

In moving forward, while the joint venture would still be Collar Diversified, it would be marketed as "Collar Talent." (*See, e.g.*, ECF #18-17, *Hearing Ex. 23*, PageID #955 ("I would like to go to market as "Collar Talent")). Collar Diversified's clients were informed that, while

-17-

"Collar" was remaining the same "Collar Diversified" entity that they had been working with, there would be a new brand ID and communications platforms, as stated in e-mail communications sent to clients on October 7, 2022:

> Collar has made some changes to our brand ID and our communications platforms. We will be operating in the market as Collar Talent – www.collartalent.com – going forward and will be using @collartalent.com email domain addresses. The accounts@collardiversified.com email will no longer be monitored.
>
> For tax and legal purposes, nothing has changed, we are still Collar Diversified LLC with the same Tax ID information. Our CEO, Benjamin Stocum will also be following up with a phone call to verify this information and answer any questions you may have. Thank you for your business.
>
> Regards,
> Collar Talent Accounts Team

(ECF #12-1, *Exhibit 2 to Defendants' Brief in Opposition to Plaintiff's Motion for Preliminary Injunction*, PageID #355). Stocum admitted at the hearing that he undertook these changes to Collar Diversified's branding without informing Loree of the changes. (ECF #17, *Hearing Tr. 11/02/22*, PageID #620-621 (*Stocum*)).

Later that day, at 6:03 pm, Stocum e-mailed Loree telling him that Collar Diversified had separated from the brand identification platforms that had been solely controlled by Collar Jobs, and had moved to communications platforms administratively controlled by Stocum. (ECF #18-5, *Hearing Ex. 6*, PageID #854). The e-mail went on:

> I have every intention of honoring our Operating Agreement and continuing to make Collar Diversified LLC a highly profitable enterprise . . . . At this point in time, I do not have any interest in Collar Jobs, or whatever other business ventures you are pursuing/developing. I am going to build this business in the vision that you and I once shared and eventually you'll benefit handsomely.
>
> While I'm not interested in leveraging the Collar Jobs platform anymore, I still hold you in high regard professionally and I still love you, as a dear friend. In addition, I welcome your continued involvement in Collar Diversified, if you

-18-

remain interested.

Before my Dad died, he asked me to take good care of you. I intend to live up to that. I'll understand if you're upset with my approach, but I hope with time, it will be proven the right path for the entirety of Collar Diversified.

(*Id.*).

The testimony presented at the preliminary hearing provided considerable indication that "Collar Talent" is the same entity as Collar Diversified in its entirety, with the same Operating Agreement, same business operations, same clients, same location, same offices, same employees, and same ownership. (*See*, *e.g.*, ECF #16, *Hearing Tr. 11/01/22*, PageID #527 ("[W]e were doing a rebranding"), #535 ("Nothing's changed"), #541 ("None of that [working for Collar Diversified, and getting checks from Delta Diversified] has ever changed"), #547 ("[N]o difference between the way [I] identified [myself] before the changeover and rebranding and now") (*Burke*); ECF #16, *Hearing Tr. 11/01/22*, Page ID #559 ("[N]ever changed employers"), #560 (never changed the way of identification with clients, remaining as "Collar"); ECF #16, *Hearing Tr. 11/01/22*, PageID #580 (never changed way of identifying with clients as simply "Collar") (*Hyde*); ECF #17, *Hearing Tr. 11/02/22*, PageID #611 ("Collar Diversified is the same entity and has never changed"), #616 ("there's no new entity"), #659 ("I also made it clear [to the Collar Diversified employees] that we are not going to be changing the company[;] we are Collar Diversified"), #660 ("[W]e are still Collar Diversified"), #763 ("They're [the employees] operating the business as they did on October 6th with the same approaches") (*Stocum*)).

The testimony presented at the hearing also provided considerable indication that no one at Collar Diversified has ever competed with Collar Diversified, reverse engineered any information used at Collar Diversified, shared any information from within Collar Diversified

with anyone outside of Collar Diversified, or collected any fees for anyone but Collar Diversified.  (*See*, *e.g*, ECF #16, *Hearing Tr. 11/01/22* , PageID #541 (never reversed engineered), #542 (never competed with Collar Diversified), #542 (never given candidates to any other company), #542 (never collected fees for anyone but Collar Diversified); ECF #16, *Hearing Tr. 11/01/22* , PageID #558 (never disclosed anything learned at work for Collar Diversified), #558 (never reverse engineered), #560 (never taken leads from Loree and given them to anyone outside Collar Diversified) (*Rakich*); ECF #16, *Hearing Tr. 11/01/22*, PageID #569 (never shared information with competitors), #578 (never competed with Collar Diversified), #578 (never diverted clients or employees from Collar Diversified), #584 (never shared Bullhorn or spreadsheet information outside of Collar Diversified), #587 (creation of spreadsheets not for resale or competition) (*Hyde*)).

However, in its summary judgment papers, Collar Jobs has produced *some* items of evidence that a jury might find supportive of its claims.  (*See*, *e.g.*, ECF #81-2, *J. Hyde Dep.*, PageID #2378-2382 (Stocum directed Delta Diversified officer Jim Hyde to stop transfer of funds to Collar Jobs, and to "empty out" Collar Diversified's bank account); *id.* at PageID #2383-2384; ECF #83-3, *Stocum Dep.*, PageID #3120-3121 (Stocum contracted for a new Collar Talent website and moved the Collar Diversified employees over to new phone, internet, and e-mail); ECF #82-9, *Burke Dep.*, PageID #3239 ("Collar Jobs" Bullhorn identification number appears in new "Collar Talent" database.  It is for this reason that the Court finds that resolution of the claims of the *Verified Complaint*, *Counterclaims*, and *Third-Party Claims* are not appropriate for resolution on motions for summary judgment, but are rather ones permeated with

factual matters to be decided by a jury.[7]

### III.  LEGAL ANALYSIS

Summary judgment is appropriate when the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  The burden of showing the absence of any such "genuine issue" rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing FED. R. CIV. P. 56(c)).  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards.  The court will view the summary judgment motion in the light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the non-

---

[7]     As discussed in Part III-C of this *Memorandum of Opinion and Order*, in connection with Loree's motion for summary judgment (including the Court's rulings that the claims asserted against Geoffrey Loree may proceed to trial and that both Delta Diversified and Stocum can assert them), the improperly-pled "Third-Party Claims" are now effectively considered to be "Counterclaims" and will be constructively evaluated as counterclaims.  *See Baker v. Pierce*, 1987 U.S. App. LEXIS 1398, at *5, note 2 (6th Cir. Jan. 27, 1987) (recasting improperly filed "Third-Party Claims" as "Crossclaims" on appeal even though no formal motion had been filed in the district court to join the "third-party defendants" as counterclaim defendants under Federal Rule of Civil Procedure 19 (required joinder) or 20 (permissive joinder)).

movant.  The non-moving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be solved by a jury."  *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).  If the defendant "successfully demonstrates, after a reasonable period of discovery, that the plaintiff cannot produce sufficient evidence beyond the bare allegations of the complaint to support an essential element of his or her case . . . ," the court should grant summary judgment.  *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 576 (6th Cir. 2004).

Each of the three summary judgment motions are addressed in turn.  The arguments of each are grouped and presented by reference to one or more potential "material fact disputes" presented in each Count or claim.

### A.  Defendants' Motion for Summary Judgment

Defendants Delta Diversified, Stocum, and all of the remaining Delta Diversified employee defendants filed a motion for summary judgment as to all of the claims made against them by Plaintiff Collar Jobs.  Each of the Counts of the *Verified Complaint* (Counts I through XIV),[8] is addressed in turn:

> **1.  Count I:  Misappropriation of Trade Secrets Under the Defend Trade Secrets Act, 18 U.S.C. § 1836, et seq.**
> ***(By Collar Jobs Against All Defendants)***
>
> **Count II:  Misappropriation of Trade Secrets Under the Ohio Uniform Trade Secrets Act, Ohio Rev. Code § 1333.62, et seq.**
> ***(By Collar Jobs Against All Defendants)***
>
> **Count III:  Misappropriation of Trade Secrets Under the Defend Trade Secrets Act, 18 U.S.C. § 1836, et seq.**
> ***(By Collar Diversified Against All Defendants)***

---

[8]

As already noted, Count XV, seeking preliminary injunctive relief, was disposed of with this Court's denial of the motion for preliminary injunction, after a hearing, per its *Memorandum of Opinion* and *Order*, each dated November 30, 2022.  (*See* note 5, *supra*).

**Count IV:  Misappropriation of Trade Secrets Under the Ohio
Uniform Trade Secrets Act, Ohio Rev. Code § 1333.62, et seq.
*(By Collar Jobs Against All Defendants)***

The Defendants' motion for summary judgment as to Counts I through IV of the *Verified*

*Complaint* (ECF #1) turn on whether a material fact issue exists regarding the existence of a

Collar Jobs' "trade secret."

**Question:  Has Plaintiff Collar Jobs, LLC ("Collar Jobs") demonstrated the existence
of a trade secret (on which Counts I through IV of the Verified Complaint are based)?**

To prevail on a misappropriation of trade secrets claim, a plaintiff must show that:  (1) a

trade secret exists; (2) the defendants acquired the trade secret because of a confidential

relationship; and (3) the defendants used the trade secret without authorization.  *Premier Dealer*

*Serv., Inc. v. Allegiance Administrators, LLC*, 2018 U.S. Dist. LEXIS 189879, at *9 (S.D. Ohio

Nov. 6, 2018) citing *Hoover Trans. Servs. v. Frye*, 77 Fed. App's 776, 782 (6th Cir. 2003).  A

trade secret under Ohio law is defined as:

> [I]nformation, including the whole or any portion or phase of any
> scientific or technical information, design, process, procedure, formula,
> pattern, compilation, program, device, method, technique, or
> improvement, or any business information or plans, financial information,
> or listing of names, addresses, or telephone numbers, that satisfies born of
> the following:
>
> > (1)  It derives independent economic value, actual or potential,
> > from not being generally known to, and not being readily
> > ascertainable by proper means by, other persons who can obtain
> > economic value from its disclosure or use.
> >
> > (2)  It is the subject of efforts that are reasonable under the
> > circumstances to maintain its secrecy.

*Premier Dealer Serv., Inc.*, 2018 U.S. Dist. LEXIS 189879, at *9 (quoting Ohio Rev. Code

§ 1333.61(D)).

While Collar Jobs has not offered a great deal of evidence definitively identifying its

-23-

"trade secret" information, it has offered *some* evidence on which a jury could possibly find that the information provided by Collar Jobs contained elements of trade secret information. In response to an interrogatory sent by Delta Diversified to Collar Jobs' principal Geoffrey Loree,[9] asking for identification of "what proprietary trade secrets Collar Jobs LLC claims to possess," the following answer was given:

> Collar Jobs had the following confidential and/or trade secret information that may be at issue in this litigation"
>
> • All information that Collar Jobs gathered, compiled and appended relating to candidates prior to sending the candidate as a hot lead to a Collar Diversified hiring specialist;
>
> • All company contact information that Collar Jobs compiled and appended to company names in the Collar Jobs Bullhorn Database;
>
> • Candidate information contained and compiled in the Collar Jobs Bullhorn database, including but not limited to confidential candidate summaries and watermarked resumes;
>
> • All candidate information and hot leads verified and/or provided to Collar Diversified hiring specialists on and after October 1, 2022;
>
> • The CLOANX propensity model; and
>
> • Information detailed in and encompassed by the Collar Jobs NDA.
>
> Mr. Loree also refers Third-Party Plaintiffs to his testimony at the November 1-2, 2022 hearing discussing confidential and trade secret information, as well as post-hearing briefing on behalf of Collar Jobs and Collar Diversified.

(ECF #81-14, *Third-Party Defendant Geoffrey Loree's Amended and Supplemental Responses*, PageID #2593).

---

[9] While this response relates to an interrogatory propounded to Loree individually, as opposed to Collar Jobs itself, for the purposes of this analysis it serves as an identification of the claimed "trade secrets."

Trade secrets can include "any business information or plans, financial information, or listing of names, addresses, or telephone numbers" that derives independent economic value from being not readily ascertainable and where reasonable steps were taken to protect it.  *See* Ohio Rev. Code § 1333.61(D); 18 U.S.C. § 1893(3).  Even the compilation of otherwise public information can be a trade secret if it provides a competitive advantage and is not readily ascertainable.  *See Union Home Mortg. Corp. v. Payne*, 2020 U.S. Dist. LEXIS 132097, at *18-19 (N.D. Ohio March 9, 2020); *United States v. Nosal*, 844 F.3d 1024, 1042 (9th Cir. 2016)[10] (recruiting company's internal database and source lists built from public and non-public sources, including unsolicited resumes and information provided through company website can be trade secrets).

Trade secrets need only be identified with reasonable particularity.  *Claudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*, 53 F.4th 368, 381 (6th Cir. 2022).  The Court finds that Collar Jobs has done so in a manner minimally sufficient to survive summary judgment, and that an issue of material fact remains as to whether some of the candidate information may have been drawn from non-public sources, or may have been presented or arranged in a manner that was not otherwise readily ascertainable.  Summary judgment on Counts I through IV is accordingly DENIED.

> 2. **Count V**:  **Breach of the Operating Agreement**
>    *(By Collar Jobs Against Delta Diversified)*
>
>    **Count VI**:  **Breach of the Operating Agreement**
>    *(By Collar Diversified Against Delta Diversified)*

---

[10]  Collar Jobs cites the decision in this case and pertinent holding appearing at 828 F.3d 865, 882 (ECF #82).  That opinion was later withdrawn and superseded by the opinion found at 844 F.3d 1024.  The court's holding on this point, however, remains the same.

-25-

The Operating Agreement itself does not specify the exact roles to be taken by each of the 50% joint venture partners.  Thus, a significant question arises as to whether actions taken by Delta Diversified and/or Stocum, which they believed were necessary to sustain Collar Diversified, were outside of the provisions of the Operating Agreement.

**Question:  Did Defendants Delta Diversified, Inc. ("Delta Diversified") and Benjamin Stocum violate an Operating Agreement existing between the two 50% joint venture partners (on which Counts V and VI of the Verified Complaint are based) when Delta Diversified allegedly took actions without the consent of Collar Jobs and Geoffrey Loree (who directs a controlling interest in Collar Jobs)?**

Defendants argue they are entitled to summary judgment on any claims related to performance under the Operating Agreement because "Collar Jobs and Loree had no objection to Stocum and Delta running the business, hiring staff, furnishing offices and equipment, and making day-to-day operations and marketing decisions," (ECF #65, *Defendants' Motion for Summary Judgment*, PageID #1376), and that any actions taken by Delta and/or Stocum "[was] justified by a prior course of performance and/or usage of trade," (*id.*, PageID #1377).  It hardly needs to be said that Collar Jobs holds a "different view" as to what actions it may have approved, objected to, or might have been "justified by a prior course of performance and/or usage of trade," (ECF #82, *Plaintiffs' Opposition to Defendants' Motion*, PageID #2980-2984).  Resolution of these issues will rest on interpretation of the provisions of the Operating Agreement that all decisions made by Collar Diversified must be explicitly agreed upon by both "50%" joint venture partners, (ECF #82, PageID #2984).  The evidence so far offered on these disputing views presents the very essence of a material issue of fact to be determined by a jury.  Accordingly, summary judgment on Counts V and VI is DENIED.

3.   <u>**Count VII**</u>**:  Breach of Fiduciary Duty**
            *(By Collar Jobs Against Delta Diversified)*

**<u>Count VIII</u>:  Breach of Fiduciary Duty**
*(By Collar Diversified Against Delta Diversified)*

The same analysis applicable to the "Breach of the Operating Agreement" claims applies to the "Breach of Fiduciary Duty" claims, and turn on this similar question of whether unilateral actions taken by Delta Diversified and/or Stocum were necessary to sustain the business, or against the best interests of the joint venture.

**Question:  Did Defendants breach any fiduciary duties by taking "unilateral" actions on behalf of Collar Diversified and/or Collar Talent (on which Counts VII and VIII of the Verified Complaint are based) by working for "Collar Talent" after Geoffrey Loree allegedly walked away from the company and later shut down access to the "hot leads" database?**

Defendants' position can be summed up as "[t]he thrust of Plaintiffs' breach of fiduciary duty claim[s] appear[] to be that Stocum and Delta Diversified took actions in service of their own interests and benefit," (ECF #65, *Defendants' Motion for Summary Judgment*, PageID #1380).  Defendants offer various items of evidence supporting its position that "Defendants' actions were a response in service of protecting the interests of Collar Diversified, ensuring it would be able to continue operating, without delay, (*id.*, PageID #1381).

Plaintiffs' counter-position is equally summed up in its statement that "Delta argues that its actions were for Collar Diversified's benefit and that taking data from the Collar Jobs Database and uploading it into a new database to which Collar Jobs had no knowledge and has no access 'was done in response to fears of not being able to continue operating the business with Loree abandoning it, and due to the actions and behaviors of Loree disrupting the business'," (ECF #82, *Plaintiffs' Opposition to Defendants' Motion for Summary Judgment*, PageID #2985).

Again, resolution of the question of whether Stocum *needed* to take unilateral actions to keep Collar Diversified/Collar Talent running after Loree allegedly unilaterally "walked away"

-27-

from the business and shut down the Bullhorn database raises material issues of fact for a jury to

decide.  Accordingly, summary judgment on Counts VII and VIII of the *Verified Complaint* is

DENIED.

> **4.  Count IX:  Breach of Noncompete Obligations**
> ***(By Collar Diversified Against Employees)***
>
> **Count X:  Breach of Noncompete Obligations**
> ***(By Collar Jobs Against Employees)***

Counts IX and X relate to actions taken by the "Collar Diversified"/"Collar Talent"

employees.

> **Question:  Did the employee Defendants (Pearson, Rakich, Ziccardi, Burke, Czikray,
> Lewis, and Hyde) breach nondisclosure and non-compete agreements (on which Counts IX
> and X of the Verified Complaint are based) by "sharing" "Collar Diversified" information (in
> which Collar Jobs has an interest) with "Collar Talent"?**

The primary allegation of Count IX of the *Verified Complaint* is that:

> The Employee Defendants breached their obligations under the Employee
> Agreements by (1) performing work on behalf of Delta and/or Collar Talent,
> who is in the business of recruiting *and is in competition with the Company*
> [Collar Diversified]; and (2) assisting Delta, Stocum, and/or Collar Talent in
> their preparations to subsume the Company and use its proprietary
> information.

(ECF #1, *Verified Complaint*, PageID #35, ¶ 191) (insert and italics supplied).

The primary allegation of Count X of the *Verified Complaint* is that:

> The Employee Defendants breached their obligations under the
> Nondisclosure Agreements by (1) taking confidential client and candidate
> information housed in the Collar Jobs database and using it for unauthorized
> purposes; (2) using confidential and trade secret information from Collar
> Jobs' platform, including emails, to perform work on behalf of Delta and/or
> Collar Talent; and (3) using Collar Jobs' marketing and customer
> information to assist Delta and Stocum in their plans to *compete with the
> Company* [Collar Diversified].

(ECF #1, *Verified Complaint*, PageID #34, ¶ 199) (insert and italic supplied).

-28-

The premise of both of these claims is that Delta Diversified and Collar Diversified are separate and competing businesses, (*see* ECF #82, *Plaintiffs' Opposition*, PageID #2987, citing ECF #82-2, *J. Hyde Dep.*, PageID #3088 & #3091 and ECF #82-7, *Pearson Dep.*, PageID #3203), and that when any of the "Collar Diversified" employees performed their work under the auspices of "Collar Talent" that they were doing that work solely as employees of Delta Diversified and not as a continuation of work for Collar Diversified. (ECF #82, PageID #2987-2990).

It is Plaintiffs' position that Collar Talent was an "outside business" such that any work performed by the employees breached the noncompete obligations of their Employment Agreements with Collar Diversified and their nondisclosure agreements with Collar Jobs. (ECF #82, PageID #2987-90).

In response, Defendants cite evidence that "For tax and legal purposes, nothing has changed, we [Collar Talent] are still Collar Diversified LLC with the same Tax ID information," (ECF #65-11, PageID #1769) (insert supplied). Also in the record is considerable evidence presented at the preliminary injunction hearing indicating that "Collar Talent" is the same entity as Collar Diversified in its entirety, with the same Operating Agreement, same business operations, same clients, same location, same offices, same employees, and same ownership. (*See*, *e.g.*, ECF #16 [Hearing Tr. 11/01/22], PageID #527 ("[W]e were doing a rebranding"), #535 ("Nothing's changed"), #541 ("None of that [working for Collar Diversified, and getting checks from Delta Diversified] has ever changed"), #547 ("[N]o difference between the way [I] identified [myself] before the changeover and rebranding and now") (*Burke*); ECF #16 [Hearing Tr. 11/01/22], Page ID #559 ("[N]ever changed employers"), #560 (never changed the way of identification with clients, remaining as "Collar"); ECF #16 [Hearing Tr. 11/01/22], PageID

#580 (never changed way of identifying with clients as simply "Collar") (*Hyde*); ECF #17 [Hearing Tr. 11/02/22], PageID #611 ("Collar Diversified is the same entity and has never changed"), #616 ("there's no new entity"), #659 ("I also made it clear [to the Collar Diversified employees] that we are not going to be changing the company[;] we are Collar Diversified"), #660 ("[W]e are still Collar Diversified"), #763 ("They're [the employees] operating the business as they did on October 6th with the same approaches") (*Stocum*)).[11]

An examination of the testimony cited by Plaintiffs at the pages noted above, as well as other testimony offered by Plaintiffs elsewhere in its motion papers, while not entirely as supportive of the proposition as the assertions of its briefing claim, it does provide *some* evidence that a jury could rely upon that "Collar Talent" was a "new" entity branching off from Collar Diversified to a degree sufficient to possibly be considered a "competing entity" such that the noncompete provisions of the Employment Agreements and the Nondisclosure Agreements are implicated.

It is a question for a jury to decide.  Accordingly, summary judgment for Defendants on

---

[11] Plaintiffs' *Opposition Brief* cites the Sixth Circuit decision in *Grudzinski v. Staren*, 87 F. App'x 508 (6th Cir. 2004), for the proposition that "findings made in the course of deciding whether to issue a preliminary injunction . . . generally do not establish the law of the case," *id.* at 512.  While this is an accurate statement of the law, the Sixth Circuit noted this in the context of factual findings made in the course of previously issuing a preliminary injunction in *favor* of a plaintiff (that she did not have an adequate hearing related to termination of her employment) in a case where summary judgment was later granted against her, upholding her termination.  The Sixth Circuit made its pronouncement to highlight the *lesser* burden of proof needed to be shown by a plaintiff in order to prevail on a motion for preliminary injunction, and instructed that while evidence offered by a plaintiff (or movant) may be sufficient to support preliminary injunctive relief, it may not represent the "law of the case" for purposes of meeting the higher burden applied in evaluating a motion for summary judgment.  In this case, *Defendants* are pointing to evidence that Plaintiffs failed to overcome even under the *lesser* burden applied to Plaintiffs' claims at the preliminary injunction stage.  While not establishing the "law of the case," these facts are pertinent as to whether there is evidence supporting the Defendants' position here.

these Counts is DENIED.

     5.   **<u>Count XI</u>: Tortious Interference With Contractual Relationship**
           *(By Collar Diversified Against Stocum and Delta Diversified)*

           **<u>Count XII</u>: Tortious Interference With Contractual Relationship**
           *(By Collar Jobs Against Stocum and Delta Diversified)*

Defendants' *Motion for Summary Judgment* on Counts XI and XII raises essentially the same questions on which Counts IX and X are based.

     ***Question: Did the Defendants "interfere with the contractual arrangement" between Collar Jobs and Delta Diversified – and jointly, as Collar Diversified (on which Counts XI and XII of the Verified Complaint are based), by continuing to perform their jobs as Collar Talent, if, in fact, Collar Diversified and Collar Talent are the same entity?***

For the same reasons as are applicable in evaluating the breach of noncompete provision claims of Counts IX and X, specifically, whether actions taken by "Collar Talent" were a necessary continuation of the interests of Collar Diversified or were the start of a competing interest, summary judgment on these claims is not appropriate. Evaluation of the determinative facts regarding the creation and operation of "Collar Talent" – disputed by the parties – and whether Delta Diversified and Stocum "interfered" with the provisions of the Defendant employees' obligations under their Employment Agreements with "Collar Diversified " or their Nondisclosure Agreements with Collar Jobs are factual matters for a jury to decide.

Thus, summary judgment for Defendants on these Counts is DENIED.

     6.   **<u>Count XIII</u>: Conversion**
           *(By Collar Jobs Against All Defendants)*

           **<u>Count XIV</u>: Conversion**
           *(By Collar Diversified Against All Defendants)*

Finally, Defendants assert that they are entitled to summary judgment on Counts XIII and XIV on the ground that they are no different from, and thus preempted by, Counts I through IV,

alleging claims under the Uniform Trade Secrets Act (Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*.) and Ohio Uniform Trade Secrets Act (Ohio Rev. Code § 1333.61, *et seq*.). This raises the following mixed question of law and fact.

**Question:  Are Plaintiff Collar Jobs' "conversion" claims (on which Counts XIII and XIV of the Verified Complaint are based) preempted by their Uniform Trade Secrets Act (Defend Trade Secrets Act, 18 U.S.C. § 1836, et seq.) and Ohio Uniform Trade Secrets Act (Ohio Rev. Code § 1333.61, et seq.) claims (Counts I-IV of the Verified Complaint).**

Defendants characterize Plaintiff Collar Jobs' "conversion" claims, Counts XIII and XIV, as based solely on allegations that they "wrongfully" held on to and utilized trade secret and/or proprietary information purportedly belonging to Collar Jobs.

Plaintiff Collar Jobs states that the claims of Counts XIII and XIV are based on Defendants' failure to pay a subscription fee for use of Collar Jobs' "hot leads" during the first week of October 2022.

Because Plaintiffs have identified a credible factual focus of these claims outside of purely a "trade secret" focus, specifically assertions based on Defendants' (or at least Defendants Delta Diversified and Stocum) failure to pay amounts owed under a purported obligation to pay them under a subscription fee arrangement, an argument that the claims are legally preempted is not supported.  A factual issue then arises as to whether actions taken by Loree excused any obligation to continue payment of the "subscription fee" to Collar Jobs, or whether those obligations remained.  Accordingly, summary judgment on these claims is DENIED.

**B.  Collar Jobs' Motion for Summary Judgment**

1. **Count I**:  Fraud
   *(By Delta Diversified and Stocum Against Collar Jobs)*

<u>**Count II**</u>:  **Fraudulent Inducement**
*(By Delta Diversified and Stocum Against Collar Jobs)*

Counts I and II of Defendants' counterclaims against Collar Jobs revolve on the following question of material fact:

***Question:  Did Defendant Delta Diversified or any of its principals truly rely on inaccurate representations by Geoffrey Loree or others at Collar Jobs to be induced into participating in a joint venture?***

Defendant Stocum and others at Delta Diversified state that they were promised a unique software product that could streamline the process of identifying top-quality job applicants and fulfill other technical requirements, but did not receive what they were promised and instead were given what amounted to simply a database of publicly available information.  (*See, e.g.,* ECF # 65-2, *Stocum Dep.,* PageID #1624).  Collar Jobs and Loree offer evidence that Delta Diversified's decision to enter into a joint venture was not based on any representations but rather a track record of performance.  (See, e.g., ECF #66, *Collar Jobs, LLC's Motion for Summary Judgment*, PageID #1787, citing *J. Hyde Dep.*, PageID #1864).  Each of the parties, Delta Diversified and Stocum, as well as Collar Jobs, offer numerous and various passages of deposition testimony, none of which is either definitive of the propounding party's assertions nor negating of the opposing party's position.

In light of these opposing items of somewhat ambiguous, but existing, evidence in support of each side's assertions, the issues of whether certain statements were made, in what context they were made if they were in fact made, and whether "justifiable reliance" existed based on such statements or actions, creates what amounts to a definitive dispute of material fact on the fraud and fraudulent inducement claims raised in Defendants' counterclaims.  These are not issues for a court to decide, but rather ones for a jury to decide based on the credibility of the

-33-

witnesses offering testimony. Accordingly, Plaintiffs' motion for summary judgment on these claims is DENIED.

> ### 2. **Count III: Breach of Contract**
> ### *(By Delta Diversified and Stocum Against Collar Jobs)*
>
> ### **Count IV: Breach of Fiduciary Duties**
> ### *(By Delta Diversified and Stocum Against Collar Jobs)*

Defendants' breach of contract claims and breach of fiduciary claims revolve around three fundamental questions:

> *Question: Did Collar Jobs' principal Geoffrey Loree walk away from participation in Collar Diversified's business in August 2022, and thereafter unilaterally shut down access to its candidate database based on a false claim of there being a "data security breach"?*

> *Question: Did Delta Diversified acquiesce in branding changes to Collar Diversified made unilaterally by Geoffrey Loree, thus waiving any breach of the Operating Agreement that may have been occasioned by those changes?*

> *Question: Did Collar Jobs and Geoffrey Loree breach the Operating Agreement by shutting down the "Bullhorn" database and denying access to it by Delta Diversified employees based on a false claim of a data security breach?*

As indicated earlier in this *Memorandum of Opinion*, and as is evident from all the motion papers, the parties have significant disagreements over the actual unfolding of events regarding whether Loree "walked away" from the joint venture in August 2022, whether Stocum "fully acquiesced" in "Collar" branding changes allegedly unilaterally imposed by Loree, whether there was any real evidence of a "security breach" warranting Loree to shut down the Bullhorn database (there is no dispute that it was actually shut down, but some dispute as to the effects of it), and whether actions taken in response to each of these by Delta Diversified employees and Stocum was done in furtherance of the Collar Diversified joint venture or in "competition" with it. The strength of *all* the evidence offered by either side on each of these issues comes down to making a decision on the credibility of the party or parties offering it.

-34-

Once again, determination of the "true facts" surrounding each of these purported events are not issues for a court to decide, but rather ones for a jury to decide based on the credibility of the witnesses offering testimony.  Accordingly, Plaintiffs' motion for summary judgment on these claims is DENIED.

### C.  <u>Geoffrey Loree's Motion for Summary Judgment</u>

#### *A Preliminary Procedural Issue as to "Third-Party" Claims*

At the outset of Loree's motion, before turning to the individual claims raised against him, he asserts that summary judgment as a matter of law should be granted against maintaining Delta Diversified's and Stocum's *Third-Party Complaint*,[12] citing Federal Rule of Civil Procedure 14, on the ground that neither Delta Diversified's nor Stocum's claims against Loree assert derivative liability against Loree for any liability that may be incurred by Delta Diversified or Stocum (ECF #68, *Loree Motion for Summary Judgment*, PageID #1970-1971).  *See* FED. R. CIV. P. 14(a) ("A defending party may, as third-party plaintiff, serve a summons and complaint on a nonparty who is or may be liable to it for all or part of the claim against it"); *see also Amer. Zurich Ins. Co. v. Cooper Tire & Rubber Co.*, 512 F.3d 800, 805 (6th Cir. 2008) ("A defendant attempting to transfer the liability asserted against him by the original plaintiff to the third-party defendant is therefore the essential criterion of a third-party claim"); *Baker v. Pierce*, 1987 U.S. App. LEXIS 1398 (6th Cir. Jan. 27, 1987), at *5, note 2 ("[A] third-party complaint is permitted only when the third party is attempting to transfer liability for the plaintiff's claim against him").

Delta Diversified and Stocum counter that their claims (undeniably asserted as "Third-

---

[12]    Included as part of *Defendants' Answer to Plaintiffs' Complaint, Counterclaim, and Third Party Complaint* (ECF #11).

-35-

Party" claims) "were never asserted under Fed. R. Civ. P. 14," but "[r]ather, these claims are being asserted under Fed. R. Civ. P. 13(g) and that Loree was "effectively" joined to the litigation under Fed. R. Civ. P. 20(a)(2)" (ECF #80, *Third-Party Plaintiffs' Brief in Opposition*, PageID #2251). Defendants Delta Diversified and Stocum must concede that no motion to *actually* join Loree as a party was ever filed under Federal Rules of Civil Procedure 19 or 20. (ECF #80, PageID #2251) ("Although there was no explicit motion for a joinder of parties, Loree was effectively joined by Delta and Stocum's Complaints against him and his responses").

By asserting their claims as "Third-Party" claims, it *does* appear that Delta Diversified's and Stocum's claims *were* in fact "asserted" under Federal Rule of Civil Procedure 14, which governs "Third Party Practice," and not under Federal Rule of Civil Procedure 13, which governs "Counterclaim and Crossclaim," as they now argue. But this is not necessarily fatal to maintaining their claims.

There is no doubt that the gist of the "third-party claims" against Loree is based on a claim that the "corporate veils" of Collar Jobs and Park Resilience can be "pierced" to hold Loree individually responsible for any harm Delta Diversified or Stocum may have suffered out of the transactions and occurrences at issue in the overall litigation. Under Federal Rule of Civil Procedure 8(e), "[p]leadings must be construed so as to do justice." In this vein, the Sixth Circuit has itself, in one of the authorities cited by Loree, approved of construing claims erroneously brought as "third-party claims," under Federal Rule of Civil Procedure 14, as counterclaims or crossclaims, under Federal Rule of Civil Procedure 13, even if no formal joinder had occurred under Federal Rule of Civil Procedure 19. Stating the full text of the portion of the *Baker* text, cited only in part by Loree:

Allowing defendants to file a third party complaint . . . was erroneous.

-36-

> Under Fed. R. Civ. P. 14(a), a third party complaint is permitted only when the third party plaintiff is attempting to transfer liability for the plaintiff's claim against him. The third party defendant's liability must be secondary or derivative. Such is not the case here. At the same time, the grantees [named as "third party defendants"] could properly have been joined as defendants in this matter under Fed. R. Civ. P. 19. Once so joined, the defendant heirs [which included the "third party plaintiff"] could seek relief by filing a cross-claim. Such a claim would be within the ancillary jurisdiction of the court. In order to permit the appeal, we have construed the third party complaint as a cross-claim.

*Baker v. Pierce*, 1987 U.S. App. LEXIS 1398 (6th Cir. Jan. 27, 1987), at *5, note 2.

Accordingly, consistent with *Baker*, and "constru[ing] the pleadings to do justice" under Federal Rule of Civil Procedure 8(e) to address the claims as they have *actually been litigated* over the past year, summary judgment is denied as to Loree's Federal Rule of Civil Procedure 14 argument, and the Court will address the claims brought against Loree as counterclaims under Federal Rule of Civil Procedure 13, and construing Loree as constructively joined as a counterclaim defendant under Federal Rule of Civil Procedure 19.

### A Preliminary Factual and Legal Issue on Whether the "Corporate Veil" of Collar Jobs and Park Holdings May be "Pierced" by Delta Diversified to Assert Claims Against Loree Individually

The Court must next address whether there is a factual and legal basis for Delta Diversified's (and Stocum's, if he can bring claims on his own behalf) "piercing the corporate veil" theory to proceed.

**Question: Does the evidence support a finding that Collar Jobs is truly an independent entity, or is it merely an "alter ego" of Geoffrey Loree, such that Loree should be individually liable for any damages allegedly caused by the actions of Collar Jobs?**

There is, admittedly, not a great deal of hard evidence produced by Defendants on which to base their claim that "Collar Jobs 'has no separate mind, will, or existence of its own,'" (*See* ECF #80, *Third-Party Plaintiffs' Brief in Opposition*), such that it, and in turn Park Holdings, is

merely the "alter ego" of Geoffrey Loree – but there is *some* such evidence on which a jury could rely to make such a finding.

Loree offers evidence that Collar Jobs filed a Certificate of Formation in Delaware in 2019, (ECF #68-11, *Loree Motion for Summary Judgment* [Ex. I]), that it filed its own tax returns in 2020 and 2021, (ECF #68-12 [Ex. J]), that it entered into contracts under the Collar Jobs name, (ECF #68-14 [Ex. L] & #68-15 [Ex. M]), and that it invoiced Delta Diversified with the name Collar Jobs, (ECF #68-16 [Ex. N]), but the deposition testimony he offers expresses his uncertainty as to whether he knows if the original members of the "Board" at the time of the filing of the Certificate of Formation are still members, (ECF #68-13 [Ex. K]), knowledge that would seem readily known if all corporate formalities are observed, especially for an entity of such small size. Collar Jobs' discovery responses appear to show Loree as the only Director of Collar Jobs (ECF #68-9 [Ex. G] & #68-10 [Ex. H]).

At the preliminary injunction hearing, Loree testified to being the 100% owner of Collar Jobs by virtue of being the 100% owner of Park Resilience: "I am personally a hundred percent owner of Park Resilience Holdings, which owns a hundred percent of Collar Jobs, and Collar Jobs owns 50 percent of Collar Diversified," (ECF #16 [Hearing Tr. 11/01/22], PageID #378-380). While his interrogatory responses name others with alleged ownership, (ECF #68-10 [Ex. H]), his testimony from the hearing seems to create some level of uncertainty as to the actual issue of ownership and control.

Perhaps the strongest evidence showing that there are factual issues as to whether Collar Jobs and Geoffrey Loree are possibly "alter egos" of one another is the preliminary injunction hearing testimony. Throughout two full days of witness testimony, including almost a full day of testimony from Loree, the sense that Loree has unilateral control over Collar Jobs was strong.

No other person from "Collar Jobs" was ever mentioned throughout two days of testimony, save for Geoffrey Loree's son, Gabe. No action taken by Collar Jobs was distinguishable from actions taken unilaterally by Loree, whether it be in connection with representations made, the activities of Collar Jobs throughout the existence of Collar Diversified, the offered evidence of Loree personally "walking away" from Collar Diversified being one and the same with Collar Jobs' disengagement with the joint venture, and the decision to shut down the Bullhorn database being one taken unilaterally by Loree. (ECF #16, *Hearing Tr. 11/01/22* & #17 *Hearing Tr. 11/02/22*).

The parties agree as to the appropriate standard to be used to determine if the corporate veil should be pierced to hold a controlling party liable for the acts of the corporate entity, which is that set forth in *Dombroski v. Wellpoint*, otherwise referred to as the "*Belvedere-Dombroski*" test, which requires a plaintiff seeking to pierce the corporate veil to show: "(1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong." *McElroy v. FirstEnergy Corp.*, 824 F. App'x 97,99 (3d Cir. 2020).

The Court finds that the evidence presented at both the earlier hearing and now in the summary judgment papers creates a sufficient amount of evidence that a jury could possibly find that Loree's control over Collar Jobs, and its 100% owner, Park Resilience, was "so complete that the corporation [Collar Jobs] has no separate mind, will or existence of its own." Accordingly, Loree's motion for summary judgment on the claims (now designated as counterclaims), on the ground that Delta Diversified cannot proceed on a "piercing the corporate

veil" theory, is DENIED.

### A Preliminary Issue as to Whether Stocum May Assert Claims Individually

A question still remains as to whether individual Defendant Benjamin Stocum may maintain the four counts of the "Third-Party Complaint" (now crossclaims) against Loree.

**Question:  Is Delta Diversified principal Benjamin Stocum a party who can assert claims on his own behalf against Collar Jobs as counterclaims and against Loree as third-party claims?**

A third-party beneficiary has enforceable rights under a contract if he is an "intended beneficiary" as opposed to only an "incidental beneficiary." *Norfolk & W. Co. v. U.S.*, 641 F.2d 1201, 1208 (6th Cir. 1980).  The Supreme Court of Ohio has adopted an "intent to benefit" test to determine if a third party is an intended or incidental beneficiary.  *State ex rel. DeWine v. Mastergard*, 2016 Ohio App. LEXIS 592, at *7 (Ohio App. Ct. 10th Dist. Feb. 23, 2016), citing the Ohio Supreme Court decision in *Hill v. Sonitrol of SW. Ohio*, 36 Ohio St. 3d 36, 40, 521 N.E.2d 780 (1988):

> In *Norfolk & Western Co. v. United States* (C.A. 6 1980), 641 F.2d 1201, 1208, the United States Court of Appeals for the Sixth Circuit, applying Ohio law, explained the "intent to benefit" test, a test used to determine whether a third party is an intended or incidental beneficiary:
> " * * * Under this analysis, if the promisee * * * intends that a third party should benefit from the contract, then that party is an 'intended beneficiary' who has enforceable rights under the contract.  If the promisee has no intent to benefit a third party, then any third-party beneficiary to the contract is merely an 'incidental beneficiary,' who has no enforceable rights under the contract."

*State ex rel. DeWine v. Mastergard*, 2016 Ohio App. LEXIS 592, at *7.

Collar Jobs highlights the fact that Stocum was not a direct party to the Operating Agreement and asserts that he has sustained no injury.  (ECF #68, *Loree Motion for Summary Judgment*, PageID #1978-1980).  Defendants, including Stocum, offer *some* evidence that could

-40-

support a finding by a jury that both he and Loree may have been "intended beneficiaries" of the

joint venture agreement, and that he, Stocum, individually incurred damages as a result of

allegedly misleading statements made by Loree and Collar Jobs, (ECF #80, *Third-Party*

*Plaintiffs' Brief in Opposition*, PageID #2256-2257, 2261), including evidence supporting the

fact that the "Collar Diversified" joint venture was, at its essence, an agreement between two

longtime friends to go into business together, (ECF #65, *Defendants' Motion for Summary*

*Judgment*, PageID #1408 [Ex. A, *Loree Dep.*, pp. 74-75] & PageID #1580 [Ex. B, *Stocum Dep.*,

p. 23]).  Evidence on this latter point was also presented at the earlier preliminary injunction

hearing, as indicated by a communication sent by Stocum to Loree in October 2022:

> I have every intention of honoring our Operating Agreement and
> continuing to make Collar Diversified LLC a highly profitable enterprise . .
> . .  At this point in time, I do not have any interest in Collar Jobs, or
> whatever other business ventures you are pursuing/developing.  I am going
> to build this business in the vision that you and I once shared and
> eventually you'll benefit handsomely.
>
> While I'm not interested in leveraging the Collar Jobs platform anymore, I
> still hold you in high regard professionally and I still love you, as a dear
> friend.  In addition, I welcome your continued involvement in Collar
> Diversified, if you remain interested.
>
> Before my Dad died, he asked me to take good care of you.  I intend to live
> up to that.  I'll understand if you're upset with my approach, but I hope
> with time, it will be proven the right path for the entirety of Collar
> Diversified.

(ECF #18-5 [Hearing Ex. 6], PageID #854).

There is sufficient evidence in the record to create a question of fact as to whether both

Stocum and Loree were intended beneficiaries of the Operating Agreement, such that the issue is

a factual one for a jury to decide, rather than a legal issue for the Court.  Accordingly, Loree's

motion for summary judgment on the claims (now designated as counterclaims), on the ground

-41-

that Defendant Benjamin Stocum is legally incapable of asserting them, is DENIED.

*The Substantive Claims of the "Third-Party Complaint" (Counterclaims)*

Loree also moves for summary judgment asserting that all of the claims asserted by

Stocum "fail as a matter of law because they are without evidentiary or legal support." (ECF #68,

*Loree Motion for Summary Judgment*, PageID #1978).

1. **Count I: Fraud**
   *(By Delta Diversified and Stocum Against Geoffrey Loree)*

   **Count II: Fraudulent Inducement**
   *(By Delta Diversified and Stocum Against Geoffrey Loree)*

2. **Count III: Breach of Contract**
   *(By Delta Diversified and Stocum Against Geoffrey Loree)*

   **Count IV: Breach of Fiduciary Duties**
   *(By Delta Diversified and Stocum Against Geoffrey Loree)*

Given the Court's finding that there is sufficient evidence in the record for a jury to find

that Stocum and Loree were intended beneficiaries of the Operating Agreement sufficient to

maintain contract-based claims individually, it follows that the joint venture agreement of "Collar

Diversified" creates fiduciary duties upon them as well. Parties to a joint venture owe each other

fiduciary duties, such as a duty of full disclosure and a duty against self-dealing. *See Nilavar v.

Osborn*, 127 Ohio App. 3d 1. 20, 711 N.E.2d 726 (Ohio App. 1998). This duty is implicated in

Delta Diversified's and Stocum's claims regarding Loree's possibly misleading representations

regarding Collar Jobs' technical capabilities as well as his unilateral shutting down of the Bullhorn

database on potentially false claims of a "data breach."

The same analysis applies to the fraud and fraudulent inducement claims. Given that a jury

could find that Stocum was an intended third-party beneficiary to the Operating Agreement and to

the ongoing rights and responsibilities of Collar Diversified, and that evidence exists such that a

jury may find that the corporate veil may not shield Loree from individual liability, and that the "third party claims" are now cast as counterclaims, these claims (Counts I and II of the "Third-Party Complaint") are now essentially merged with the fraud and fraudulent inducement claims of Defendants' counterclaims against Collar Jobs (Counts I and II of the Counterclaims), (ECF #11, PageID #315-324), such that the counterclaims are now effectively brought by Defendants Delta Diversified *and Stocum* against Counterclaim Defendants Collar Jobs *and Loree*. Contrary to the assertions made by Loree, the claims against him are not "duplicative" in that Delta Diversified and Stocum seek to "recover twice for the exact same alleged conduct," as Loree contends, (ECF #84, *Loree Reply Memorandum*, PageID #4084), but rather are assertions now joined as counterclaims brought by Defendants Delta Diversified *and Stocum* against Collar Jobs *and Loree* seeking a single relief.

Thus, just as the Court has already found that summary judgment on the counterclaims (as actually filed as counterclaims against Collar Jobs) as asserted by Defendants in *Defendants' Answer to Plaintiffs' Complaint, Counterclaim, and Third-Party Complaint*, (ECF #11), is not appropriate, nor is Loree's motion for judgment on these "Third Party" claims (now positioned as additional counterclaims). Accordingly, summary judgment on these grounds is also DENIED.

## IV. CONCLUSION

For the reasons set forth above, *Defendants' Motion for Summary Judgment* (ECF #65); *Counterclaim Defendant Collar Jobs, LLC's Motion for Summary Judgment* (ECF #66); and *Third-Party Defendant Geoffrey Loree's Motion for Summary Judgment* (ECF #68), are DENIED.

A jury trial, on all claims presented in the *Verified Complaint* (ECF #1) and *Defendants' Counterclaim and Third-Party Complaint ("Third-Party" Claims Now Recast as Counterclaims)*

(ECF #11), is hereby set for Monday, January 29, 2024, to begin at 8:30 am, in Courtroom 15A.

IT IS SO ORDERED.

/s/ Donald C. Nugent
DONALD C. NUGENT
United States District Judge

DATED:  December 18, 2023